Filed 8/24/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.B., a Minor. | D069257 |
| JOHN O. et al., | (Super. Ct. No. A60345) |
| Petitioners and Respondents, | |
| v. | |
| SCOTT R., | |
| Objector and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Edlene C. McKenzie, Commissioner.  Affirmed.

Lelah S. Fisher, under appointment by the Court of Appeal, for Objector and Appellant.

Elizabeth C. Alexander and Neal B. Gold, under appointment by the Court of Appeal, for Petitioners and Respondents.

Carl Fabian, under appointment by the Court of Appeal, for Minor A.B.

Scott R. appeals from an order terminating his parental rights to his biological daughter, A.B., under Family Code section 7822,[1] which authorizes the termination of rights of a parent who "has left the child in the care and custody of the other parent *for a period of one year* without any provision for the child's support, or without communication . . . with the intent . . . to abandon the child."  (§ 7822, subd. (a)(3), italics added.)  He contends that the one-year statutory period refers only to the year immediately preceding the filing of the petition for termination of parental rights, which precludes its application to him.  Alternatively, Scott asserts that reversal is warranted in any event because (1) he rebutted the presumption that he intended to abandon A.B., (2) the termination of his rights was not in A.B.'s best interests and (3) the juvenile court erred in determining that the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) did not apply absent proof that a tribe he identified actually received notice as required under that statutory scheme.  We reject Scott's arguments and affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

Scott and Michaela O. met in November 2005.  The couple moved in together three and one-half months later, and lived together on and off for almost four years. During that time, Scott was using marijuana and alcohol.  After Michaela became pregnant with A.B., she broke up with Scott and moved out.  Michaela gave birth to A.B. in November 2009.  Scott was not present for the birth, but visited the hospital two or

---

[1]     All further statutory references are to the Family Code unless otherwise specified.

three hours later, bringing a pizza and asking to hold the baby. Scott was not named as A.B.'s father on A.B.'s birth certificate.

Scott sent Michaela a $50 money order, but she rejected it. He also offered to bring her baby food, but Michaela told him she did not need it, as A.B. was breast-feeding. Scott did not offer to provide any further assistance and did not see A.B. again until two months later, in January 2010, when he met with Michaela and A.B. for approximately two hours. Scott did not otherwise send gifts, cards or other items to A.B.

In early 2010, Michaela sought benefits for A.B. through the Department of Child Support Services (DCSS). Scott questioned whether he was A.B.'s father and requested a paternity test, noting on his income and expense declaration that if A.B. was his child, he would pay support and "wish for partial custody." Around that same time, Scott visited Michaela's house but Michaela was not available to see him, and she did not learn of the visit until after Scott had left.

Scott was determined to be A.B.'s biological father and the court issued an order in September 2010 requiring him to pay DCSS for A.B.'s support and to obtain health insurance for her if "available at no or reasonable cost." Scott did not request visitation, but began paying support in October 2010, and continued paying consistently, through wage garnishment, almost every month thereafter, although he never provided A.B. with health insurance.

Sometime in 2011, when Scott tried, unsuccessfully, to visit Michaela, Michaela's brother suggested that he seek court authorization to visit A.B. Scott went to family court and obtained the necessary paperwork to set up visitation, but did not take any further

3

action after being told it would cost $400 to file the forms. Scott attempted to visit Michaela again in 2012, but she was not home.

In April 2013, Michaela began dating John O. Within a few months, John became involved in A.B.'s care and he began providing financial support for her in October 2013. A.B. called John "Daddy" and became very bonded to him. In the fall of 2014, Michaela moved in with John and they thereafter married.

At about the same time, Michaela had a "falling out" with her family. In October 2014, Scott sent a letter to Michaela, inquiring about A.B. and explaining that he planned to seek visitation through the court by A.B.'s fifth birthday (in November 2014). Shortly thereafter, Michaela's mother contacted Scott.

In late October 2014, Scott initiated a family court proceeding to obtain visitation. He acknowledged that he did not know A.B. and had only seen her a few times since her birth, but emphasized his self-improvement, stating that although he "use[d] to have a drinking problem . . . ", he was now sober and had worked on becoming "a more responsible and more reliable [f]ather." In his visitation request, Scott noted his relationship with Michaela's family and suggested starting visitation at Michaela's mother's home. Michaela called Scott after seeing the visitation request, and they had a lengthy conversation. Scott primarily discussed Michaela's mother, stating that she wanted to see A.B. again, he believed seeing her would be in A.B.'s best interests, and he wanted to visit with A.B. at her house.

Michaela and Scott participated in mediation to address Scott's visitation request. Based on their agreement, the family court ordered a therapist to oversee A.B.'s

4

introduction to Scott and subsequent visitation. The therapist met individually with A.B., Scott, and Michaela and held conjoint sessions with Scott and A.B. in February and March 2015, although Scott did not take full advantage of the authorized visitation. Scott tried to develop a relationship with A.B., but they had limited interaction during the therapy sessions. At the second session, Scott played his guitar and A.B. hugged him when the session was over.

The conjoint therapy sessions proceeded "on a reasonable basis," but ended in March 2015, when John petitioned to terminate Scott's parental rights so that he could adopt A.B.[2] In response to John's petition to terminate Scott's rights, a social worker scheduled interviews with A.B.'s family. Scott was hesitant to meet, and the social worker had to contact him four to five times to set up his interview, which was unusual for a parent facing termination of parental rights. Moreover, at Scott's request, Michaela's mother and stepfather were included in his interview.[3] In her report, the social worker recommended that Scott's parental rights not be terminated, based on her conclusion that he neither abandoned nor intended to abandon A.B.

Despite her earlier recommendation, the social worker testified at the hearing on John's petition that Scott's five-year absence deprived A.B. of stability and that John had provided A.B. with stability and continuity of care during the preceding two years. The

---

[2] At respondents' request, we take judicial notice of John's adoption petition. (Evid. Code, § 452, subd. (d)(1).)

[3] Michaela's mother and stepfather also had multiple "excited" telephone conversations with the social worker.

social worker also acknowledged that the timing of the falling out between Michaela and her mother and Scott's request for visitation "was likely not to be coincidental."

Michaela and Scott presented conflicting testimony at the hearing as to Scott's attempts to initiate contact with A.B. between 2010 and 2014. Scott introduced evidence (including testimony from Michaela's family members) that he sent Michaela several letters between 2009 and 2014, but Michaela testified she never received any letters from him.[4]

Similarly, Scott testified that Michaela started blocking his telephone calls in 2012 and introduced testimony from Michaela's family that he had called Michaela several times asking to see A.B., but Michaela had ignored his messages. By contrast, Michaela testified that Scott had called her periodically through 2011 but never requested visitation with A.B., and she had not returned his calls because she did not want to give him false hope regarding their relationship. Michaela admitted that she changed her phone number in 2012, but retained voice mail for her old number (which she checked weekly), until late summer of 2013.

After the close of evidence, the court noted the absence of evidence as to the cause of the "huge falling out" between Michaela and her family, but indicated that its focus was on Scott and his actions with respect to A.B. It ruled in relevant part that: (1) Michaela's testimony as to Scott's efforts to establish contact was much more credible

---

[4]     Michaela had lived in her deceased grandmother's house during this time and some of her relatives testified that Michaela received numerous letters from Scott at the house; however, as the juvenile court noted, these family members provided inconsistent testimony as to who was living in the house over that time period.

than that of her family members; (2) Scott was aware of the family court and its procedures but made no meaningful attempt to request visitation until 2014; (3) when Scott first sought visitation at that time, he did not emphasize that Michaela had kept him away from A.B., but instead focused on his personal struggles, which suggested that he was not actively interested in establishing contact with A.B. prior to 2014; (4) Scott failed to have meaningful contact with A.B. for a period of more than one year; (5) the support Scott paid sporadically over the years was token; (6) Scott's communications with Michaela's family members failed to establish that he had a meaningful relationship with A.B.; and (7) A.B. had a good relationship with John, such that adoption was in her best interests. The court therefore ordered termination of Scott's parental rights.

Scott timely appealed.[5]

DISCUSSION

I

*Application of Section 7822*

Section 7822 establishes the grounds for terminating parental rights due to a parent's voluntary abandonment and, in pertinent part, allows for commencement of proceedings where "[o]ne parent has left the child in the care and custody of the other parent *for a period of one year* without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the

---

[5] In the proceedings below, A.B.'s counsel argued that adoption was in the child's best interests based on her age and the significance of Michaela and John in her life. On appeal, A.B.'s appellate counsel has changed approaches, now joining in Scott's arguments that the order terminating his parental rights must be reversed.

child." (§ 7822, subd. (a)(3), italics added.) This statute is liberally construed "to serve and protect the interests and welfare of the child" (§ 7801) and the juvenile court's findings must be based on clear and convincing evidence. (§ 7821.)

A.    *One-year Statutory Period for Abandonment*

Scott contends the one-year period of abandonment referenced in section 7822, subdivision (a)(3), refers solely to the year immediately preceding the filing of the petition to terminate parental rights. However, although the statutory language is clear that the one-year statutory period of abandonment must *occur* prior to the filing of the termination petition (*In re Amy A.* (2005) 132 Cal.App.4th 63, 71), neither that language, nor any case interpreting it, establishes the limitation that Scott urges. (See *In re E.M.* (2014) 228 Cal.App.4th 828, 841, fn. 8 (*E.M.*) [recognizing, but declining to decide, the issue]). For the reasons that follow, we conclude that no such limitation exists.

"The interpretation of a statute is a question of law we review independently." (*In re Lana S.* (2012) 207 Cal.App.4th 94, 108.) To ascertain legislative intent, we first examine the words of the statute and, if the statutory language is clear and unambiguous, its plain meaning governs. (*In re Joshua A.* (2015) 239 Cal.App.4th 208, 214.) A court may not interpret a statute to reflect an intention that does not appear from its plain language (*In re Y.A.* (2016) 246 Cal.App.4th 523, 527), and when a particular word or phrase is used in a particular statutory scheme, the omission of similar language from a related provision is often evidence of a different legislative intent. (*In re Joshua A.*, at p. 215.)

8

The plain language of section 7822, subdivision (a)(3), describes abandonment "for a period of one year," but does not limit the one-year time period to the period immediately preceding the filing of the petition. The absence of limitation in the plain language is consistent with the interpretation of identical language in a different subdivision of section 7822's predecessor statute (former Civ. Code § 232, subd. (a)(1), (Stats. 1992, ch. 162, § 10, p. 664, appen., p. 8)) authorizing the termination of parental rights to a child who had lived in an out-of-home placement for a one-year period.[6] (*In re Connie M.* (1986) 176 Cal.App.3d 1225, 1235-1237 (*Connie M.*).)

The predecessor statute was analyzed in *Connie M.*, in which a three-month-old child was placed in foster care from November 1979 to January 1983, when she was briefly returned to the custody of her biological parents. After efforts at reunification failed and Connie was placed back in foster care, the Department of Public Social Services successfully petitioned on her behalf to terminate parental rights. Connie's mother appealed, contending in part that the statutory one-year period only applied to the year immediately preceding the filing of the petition.

The *Connie M.* court rejected the mother's argument, concluding that "to hold that the one-year period immediately preceding the filing of the petition is the requisite year would defeat the legislative purposes" of the statute. (*Connie M.*, *supra*, 176 Cal.App.3d

_____

[6]    The transition from former Civil Code section 232, subdivision (a)(1) to Family Code section 7822 was without substantive change. (23 Cal. Law Revision Com. Rep. 1, 649 (1993).) The 1984 version of former Civil Code section 232 analyzed in *Connie M.* contained the provision allowing parental termination for abandonment (now contained in Fam. Code § 7822, subd. (a)(3)) in former Civil Code section 232, subdivision (a)(1). (*Connie M.* at p. 1238; Stats. 1983 ch. 309, § 2.)

at p. 1239.) The court examined the legislative intent for former Civil Code section 232 and observed that the chapter containing the section required courts to liberally construe its provisions to " 'protect the interests and welfare of the child.' " (*Connie M.*, at p. 1239, quoting from former Civ. Code § 232.5.) The chapter further described its purpose as " 'to serve the welfare and best interests of a child by providing the stability and security of an adoptive home when those conditions are otherwise missing from his or her life.' "[7] (*Ibid.*, quoting from former Civ. Code § 232.6.)

The *Connie M.* court also found "convincing support for the interpretation that the one-year period can be any time prior to the filing of the petition" based on a comparison of the subdivisions of former Civil Code section 232. (*Connie M.*, *supra*, 176 Cal.App.3d at p. 1240.) Former Civil Code section 232, subdivision (a)(3), allowed for termination of rights if it is "shown that 'the child has been a dependent child of the juvenile court, and the parent or parents have been deprived of the child's custody *continuously for one year immediately prior to the filing of a petition pursuant to this section*.' " (*Connie M.*, at p. 1240.) According to *Connie M.*, the Legislature's use of specific language limiting the one-year period to the time immediately prior to the filing of the petition in former Civil Code section 232, subdivision (a)(3) and failure to include such language in former subdivision (a)(7), established that it did not intend for such a limitation in the latter circumstance. The court reasoned "[i]f the Legislature had intended the time period of

---

7    Former Civil Code sections 232.5 and 232.6 were carried forward without substantive change in 1992 when section 7800 et seq. were enacted (Stats. 1992, ch. 162, § 10). 23 Cal. Law Revision Com. Rep. 1, 644, 664 (1993), referencing §§ 7800, 7801, and 7890.)

[former Civil Code section 232,] subdivision (a)(7) to be the one year immediately prior to the filing of the petition, [it] would have done so explicitly, as [it] did in [former] subdivision (a)(3)."[8]  (*Connie M.*, at p. 1240.)

The express legislative purpose underlying section 7822 is identical to the legislative purpose described in *Connie M*. (23 Cal. Law Revision Com. Rep. 1, 644, 664 (1993), referencing §§ 7800, 7801, and 7890) and therefore just as in *Connie M.*, interpreting the one-year period as limited to the preceding year would defeat the legislative purposes of section 7822.  In addition, because the predecessor to section 7822, subdivision (a)(3), was one of the subdivisions included in former Civil Code section 232, the court's conclusion in *Connie M.* that the presence of specific limiting language in a different subdivision of the same statute establishes that the Legislature did not intend to include the limitation in a subdivision lacking the limiting language is equally applicable here.  Moreover, the same reasoning applies to an even earlier predecessor of section 7822.  In 1961, when the provision allowing parental termination

---

[8]     The phrase "for a period of one year" in the predecessor of a related statute has likewise been interpreted as not limited to the year immediately prior to the filing of an adoption petition. (*Connie M.*, *supra*, 176 Cal.App.3d at 1239 [referencing former Civ. Code § 224, predecessor to § 8604, Stats. 1992, ch. 162, § 10, pp. 681-682, appen., p. 7; Stats. 1990, ch. 1363, § 3, p. 6059].)  Section 8604 allows a party to adopt without the noncustodial birth parent's consent if such "parent *for a period of one year* willfully fails to communicate with, and to pay for, the care, support, and education of the child when able to do so."  (§ 8604, subd. (b), italics added.)  Courts have consistently rejected an interpretation of section 8604's predecessor that would limit the one-year period to the period immediately preceding the filing of the petition.  (*Adoption of Burton* (1956) 147 Cal.App.2d 125, 133-134; *Adoption of Christopher S.* (1987) 197 Cal.App.3d 433, 441; *Adoption of Smith* (1969) 270 Cal.App.2d 605, 608; 10 Witkin, Summary of Cal. Law (10th ed. 2005) Parent and Child, § 102, p. 170.)

for abandonment was first enacted as part of former Civil Code section 232, subdivision (a), the provision referenced a "period of one year" and "a period of at least one year" while two other subdivisions *in the same section* explicitly referred to "the period of one year continuously *immediately prior to the filing of a petition*." (Former Civ. Code, § 232, subds. (b) [addressing termination for cruel treatment or neglect] & (c) [addressing termination for habitual intemperance or moral depravity], italics added; Stats. 1961, ch. 1616, § 4, p. 3504.) Clearly, the Legislature knew how to limit the one-year period if that was its intent.

We find the analysis of *Connie M.* persuasive here and therefore conclude that limiting the language of section 7822, subdivision (a)(3), to refer only to the one-year period immediately preceding the petition would defeat the legislative purpose of the statute. We also reject A.B.'s contention that interpreting the statute to authorize a termination of parental rights where a parent abandoned a child, but subsequently established frequent and constant contact with him or her, would be "absurd." In fact, the interpretation A.B. advocates would allow a parent to abandon a child for many years, only to race to the courthouse to obtain visitation as soon as a new stepparent enters the picture, thereby precluding the court from terminating the abandoning parent's rights and interfering with the child's potential adoption, stability and security. In light of the express statutory purpose of "serv[ing] the welfare and best interest of a child by providing the stability and security of an adoptive home when those conditions are otherwise missing from the child's life" (§ 7800; see § 7890), the Legislature could have reasonably concluded that the existence of parental abandonment for a year or more at

12

any point in a child's life is a factor a court should consider in determining whether terminating parental rights is in the child's best interests, notwithstanding the parent's more recent attempts to connect with the child.

For these reasons, we conclude that the Legislature did not intend to limit the one-year period in section 7822, subdivision (a)(3), to the one year immediately preceding the filing of the petition.

B.      *Intent to Abandon A.B.*

Scott contends that even if section 7822's one-year statutory period is interpreted as occurring at any time prior to the filing of the petition, he has rebutted any presumption that he intended to abandon A.B.  " 'The questions of abandonment and of intent . . . , including the issue of whether the statutory presumption has been overcome satisfactorily, are questions of fact for the resolution of the trial court.' "  (*In re Marriage of Jill & Victor D.* (2010) 185 Cal.App.4th 491, 506.)

Although a court must make such findings based on clear and convincing evidence (§ 7821), the sole issue on appeal is whether substantial evidence supports its conclusions.  (*In re Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1010.)  In determining if substantial evidence exists, we consider the evidence in a manner that favors the order being challenged.  (*Guardianship of Wisdom* (1956) 146 Cal.App.2d 635, 639.)  We do not evaluate "the credibility of witnesses, resolve conflicts in the evidence or determine the weight of the evidence." (*E.M.*, *supra*, 228 Cal.App.4th at p. 839.)  On appeal, appellant bears the burden of establishing insufficient evidence to support the trial court's findings.  (*Ibid.*)

13

In determining a parent's intent to abandon, the superior court must objectively measure the parent's conduct, "consider[ing] not only the number and frequency of his or her efforts to communicate with the child, but the genuineness of" the parent's efforts. (*In re B.J.B.* (1986) 185 Cal.App.3d 1201, 1212.) There is no requirement that a parent intend to abandon the child permanently. (*In re Daniel M.* (1993) 16 Cal.App.4th 878, 883 (*Daniel M.*).) The Legislature has determined that a child's need for stability cannot be postponed indefinitely to conform to an absent parent's plans to reestablish contact "in the distant future." (*Id.* at p. 884.)

Under section 7822, subdivision (b), a parent's failure to provide identification, provide support, or communicate with his or her child is presumptive evidence of an intent to abandon and his or her token efforts will not overcome this statutory presumption. (See *ibid*. [allowing a court to make a determination of abandonment if it finds a parent has *either* "made only token efforts to support *or* communicate with the child"]; *Adoption of Oukes*, 14 Cal.App.3d 459, 467 [similar, under former Civ. Code, § 232].) In this case, there was substantial evidence to support the court's finding that Scott made only token efforts to communicate with A.B. for well over a one-year period.[9] The court found Michaela's testimony regarding the very limited nature and frequency of Scott's contacts with A.B. between early 2010 and the fall of 2014 credible

---

[9] Because Scott's efforts to establish contact with A.B. were minimal for the entire period from early 2010, when he last saw A.B., to his filing for visitation in the fall of 2014, the court did not need to focus on any particular one-year period within that four to five year time range.

as compared to the contrary testimony of Michaela's family members (and implicitly of Scott himself). Further, it is essentially undisputed that, although Scott initially expressed an interest in having "partial custody" when paternity was established, he did not thereafter actively inquire about A.B. or seek visitation with her until shortly before she turned five.[10]

Although Scott may not have intended to abandon A.B. permanently and his efforts toward self-improvement were admirable, the law does not require that A.B.'s life be kept in limbo based on such circumstances. In fact, doing so would not be consistent with the Legislative purpose of providing abandoned children with the stability and security of an adoptive home: " 'The reality is that childhood is brief; it does not wait while a parent rehabilitates himself or herself. The nurturing required must be given by someone, at the time the child needs it, not when the parent is ready to give it.' " (*In re Daniel M.*, *supra*, 16 Cal.App.4th at p. 884.)

Scott attempts to factually analogize his case to *E.M.*, *supra*, 228 Cal.App.4th 828, wherein this court upheld an order denying a petition to terminate the parental rights of a father who was separated from his children while he addressed his substance abuse issues. (*Id.* at pp. 833, 841.) However, unlike Scott, the father in *E.M.* "regularly telephoned the children" and "asked to see the children numerous times during the

---

10    Scott contends John and Michaela failed to prove he left A.B. without financial support. Because section 7822, subdivision (b) states the elements of abandonment in the disjunctive and we resolve the issue of abandonment by finding Scott failed to communicate with A.B. for more than one year, we need not address whether Scott further demonstrated an intent to abandon A.B. by failing to support her.

15

statutory period" and his failure to maintain regular contact was "solely because [the mother] had prevented him from doing so." (*Id.* at pp. 840-841.) In contrast, here substantial evidence establishes that Scott did not make anything other than perfunctory efforts to see A.B. from 2010 to late 2014.

Because substantial evidence supports a finding that Scott made only token efforts to communicate with A.B. for well over a one-year period of her life, the court did not err in ruling that he intended to abandon her within the meaning of section 7822, subdivision (a)(3).

C.    *The Court's Order Is in A.B.'s Best Interests*

Scott also argues that even if substantial evidence supports the trial court's findings on abandonment, we should nonetheless reverse the termination order because A.B.'s adoption by John is not in her best interests. In Scott's view, Michaela's marriage to John provided less stability to A.B., who was cut off from her grandparents and other family; he also expresses concerns about John's character. A.B. similarly argues that because she was recently deprived of her relationship with her maternal grandmother, it is not in her best interests to also be deprived of the opportunity to have a relationship with her biological father.

"[T]he decision to terminate parental rights lies in the first instance within the discretion of the trial court, 'and will not be disturbed on appeal absent an abuse of that discretion.' " (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1382.) "When applying the deferential abuse of discretion standard, 'the trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of

16

the law to the facts is reversible only if arbitrary and capricious.' " (*In re C.B.* (2010) 190 Cal.App.4th 102, 123.)

The trial court's finding that adoption by John was in A.B.'s best interests is amply supported by the record. The evidence shows Scott did not know A.B. and had no relationship with her, other than to the extent it developed during two conjoint therapy visits. In contrast, A.B. had formed a relationship with John beginning in 2013 and was very bonded to him by the time of the hearing. The therapist supervising the conjoint therapy and visitations testified that John and Michaela were the primary people in A.B.'s life and A.B. initially expressed no interest in Scott. Even the social worker who prepared the section 7822 report recommending against a termination of Scott's rights testified that John had provided A.B. with stability and continuity of care during the prior two years, something Scott failed to do during A.B.'s life.

Contrary to Scott's implication on appeal, the "evidence" of any purported issues with John's character consists of unsubstantiated hearsay statements in Scott's declarations, none of which were specifically cited to at the hearing. Moreover, although Scott argues that John's presence in A.B.'s life brought less stability and security because A.B. was cut off from Michaela's mother and other maternal family members, he cites no evidence establishing that John's relationship with A.B. and Michaela caused the family rift or that A.B. would have been better off if the court did not allow John to adopt her. Scott likewise has failed to identify any evidence to suggest that his acting as an intermediary between A.B. and Michaela's family would have created greater stability for A.B. Similarly, no evidence established that A.B.'s new relationship with Scott was an

essential substitute for her lost relationship with Michaela's mother. In any event, the test on appeal is not whether substantial evidence supports a finding the appellant wishes the court had made but rather whether substantial evidence, contradicted or not, supports the conclusions the court did make. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 872-873.)

Scott further argues that termination of his parental rights is not in A.B.'s best interests because he will no longer be obligated to provide child support for her. However, Scott forfeited appellate review of this issue because he did not raise it in the trial court. (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 810-811.) Moreover, he has not directed us to any evidence establishing that A.B. would suffer harm if Scott stopped paying such support.

Because the record contains substantial evidence to support the juvenile court's finding that adoption was in A.B.'s best interests, the juvenile court did not abuse its discretion in terminating Scott's parental rights.

II

*ICWA*

Congress enacted ICWA to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families . . . ." (25 U.S.C. § 1902.) ICWA allows a tribe to intervene in dependency proceedings because the law presumes it is in the child's best interests to retain tribal ties and heritage and in the tribe's interest to preserve future generations. (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469.) Consequently, a court cannot terminate parental rights over an Indian child without first

providing the child's tribe with notice "by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (25 U.S.C. § 1912, subd. (a).)

ICWA notice requirements "are mandatory and cannot be waived by the parties." (*In re Robert A.* (2007) 147 Cal.App.4th 982, 989.) However, "a notice violation under ICWA is not jurisdictional in the fundamental sense, but instead is subject to a harmless error analysis." (*In re G.L.* (2009) 177 Cal.App.4th 683, 695.) " 'An appellant seeking reversal for lack of proper ICWA notice must show a reasonable probability that he or she would have obtained a more favorable result in the absence of the error.' " (*In re Autumn K.* (2013) 221 Cal.App.4th 674, 715 (*Autumn K.*).)

Under California law, a court may find that ICWA does not apply to termination proceedings if proper notice is given and neither a "tribe nor the Bureau of Indian Affairs has provided a determinative response within 60 days after receiving that notice."[11] (Welf. & Inst. Code, § 224.3, subd. (e)(3); Cal. Rules of Court, rule 5.482(d)(1).) California law further provides that a "[p]roof of the notice, including copies of notices sent and *all return receipts and responses received*, shall be filed with the court in advance of the hearing . . . ." (Welf. & Inst. Code, § 224.2, subd. (c), italics added.). In

---

[11] Prior to 2008, the relevant 60-day period was tied to the *sending* of notice rather than its receipt. (See Cal. Rules of Court, former rule 5.664(f)(6), repealed eff. Jan. 1, 2008 [allowing a court to determine that ICWA was inapplicable "[i]f, after a reasonable time following the sending of notice under this rule—but in no event less than 60 days—no determinative response to the notice is received."]; see also, e.g., *In re Justin S.* (2007) 150 Cal.App.4th 1426, 1437.) In addition, the California Rules of Court still allow a court to find ICWA inapplicable when a tribe does not respond to notice 60 or more days *following service* in guardianship and conservatorship proceedings. (Cal. Rules of Court, rule 7.1015(c)(9).)

addition, no termination proceeding "shall be held until at least 10 days after *receipt* of notice by . . . the tribe . . . ." (*Id.*, subd. (d), italics added; 25 U.S.C. § 1912(a).)

During the course of the proceeding, Scott submitted an ICWA-030 form identifying four separate tribes with which A.B. might be affiliated. Respondents mailed a copy of the form and notice of the termination hearing to each of the tribes and filed a copy of the notice, proof of service and counsel's declaration with the court. By the time of the hearing in August 2015, three of the four tribes had responded, indicating that A.B. was not affiliated with them At the continued hearing, the court was informed that no response had been received from the United Keetoowah Band and, with the assent of Scott and A.B., it made a finding that ICWA did not apply.

On appeal, Scott contends the court failed to comply with ICWA's notice provisions because there is no evidence the United Keetoowah Band received actual notice of the proceeding as the result of an error in the zip code used in sending the notice. Scott is correct that the date of receipt of an ICWA notice, rather than the date of its service, is the critical time for determining whether ICWA applies in the absence of any tribal response. (Welf. & Inst. Code, §§ 224.2, subds. (c), (d), & 224.3, subd. (e)(3); also 25 U.S.C. § 1912(a).) However, at the request of Michaela and John, this court has taken judicial notice of evidence that the United Keetoowah Band actually received notice of these proceedings several months prior to the termination hearing and decided

20

not to intervene.[12] Although this evidence was not before the juvenile court at the time of the continued hearing on the termination petition and thus the court erred in finding ICWA inapplicable, it nonetheless establishes that there is no reasonable probability that Scott would have obtained a more favorable result in the absence of error, as required to establish reversible error. (*Autumn K.*, *supra*, 221 Cal.App.4th at p. 715.).

---

[12] Although an appellate court will generally not consider postjudgment evidence as a basis for reversing a termination of parental rights except in extraordinary circumstances (*In re Zeth S.* (2003) 31 Cal.4th 396, 413), here the evidence supports an *affirmance* of the decision to terminate Scott's parental rights. (*In re A.B.* (2008) 164 Cal.App.4th 832, 841 ["admission of the evidence to affirm the judgment would promote the finality of the judgment and prevent further delay"]; *In re B.D.* (2008) 159 Cal.App.4th 1218, 1223 [considering reports of proceedings occurring after the termination of parental rights to establish harmless error].) In addition, because ICWA compliance can be raised at any time, consideration of this evidence for the first time on appeal is appropriate. (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 866-867 [augmenting record with ICWA notices where appellant was challenging ICWA notice rather than termination of parental rights]; *A.B.* at pp. 841, 843 [permitting augmentation with an ICWA form, noting the ICWA issue was "distinct from the substantive merits"].)

DISPOSITION

The order terminating parental rights is affirmed.


IRION, J.

WE CONCUR:


McDONALD, Acting P. J.


PRAGER, J.*

---

*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22