Filed 6/4/24  In re Am. D.R. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Am. D.R., a Person Coming Under the Juvenile Court Law. | |
| A. D.R.,<br><br>        Appellant,<br><br>v.<br><br>Z. M.G.,<br><br>        Respondent. | A168489<br><br>(Alameda County<br>Super. Ct. No. HA21112775) |

A. D.R., the stepmother of minor Am. D.R., appeals the denial of her petition to terminate the parental rights of minor's mother, Z. M.G., pursuant to Family Code section 7822.[1]  On appeal, stepmother contends:  (1) the trial court applied the incorrect standard of proof; (2) the court failed to properly apply a "burden shifting doctrine"; (3) the court's decision is an abuse of discretion and contrary to law; and (4) substantial evidence does not support the court's decision.  We affirm.

---

[1]     All further statutory references are to the Family Code unless otherwise indicated.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and father are the parents of minor, a boy born in late 2016. By January 2019, mother and father appeared before the trial court seeking custody orders. Mother wanted to relocate to New Jersey (where she is from) with minor. Though noting there was an existing order that minor stay within the county, the court indicated mother could file a Request for Order. Father indicated mother had once already taken minor to New Jersey against court orders.

In February 2019, father appeared in court without mother, stating that he did not know where she was and that she said she was moving to New Jersey. The court granted father's request for sole physical and legal custody with no visitation rights to mother. In March 2019, father appeared in court and indicated he had retrieved minor from mother. Mother appeared by phone, and the court informed her that she could file a Request for Order or work out an agreement with father, but that minor would otherwise stay in California.

In October 2021, stepmother filed a petition seeking to terminate mother's parental rights pursuant to section 7822.[2] In support of the petition, stepmother filed a declaration averring, among other things, that: she and father have resided in their current residence since June 2019; she and father are minor's primary caretakers; they have provided minor a safe,

---

[2]    Around the same time, stepmother filed a request to adopt minor, and a document entitled "Consent to Adoption by Parent Retaining Custody" in which father declared his consent to terminating mother's parental rights and to stepmother's request to adopt minor. The Alameda County Social Services Agency wrote a report recommending the court grant stepmother's petition to adopt minor if the court found the allegations of stepmother's petition to adopt to be true, and "provided the parental rights of the mother . . . are terminated." (Boldface and italics omitted.)

stable, and nurturing environment while mother has no stable residence; mother abandoned minor; mother abducted minor, taking him to New Jersey from April to August 2017, December 2018 to January 2019, and January to March 2019 without father's consent; mother previously violated court orders; and mother falsely claimed that father had abused her. Various other documents accompanied the petition and stepmother's later filings, e.g., a marriage certificate showing father and stepmother were married in May 2020, and transcripts from the aforementioned 2019 hearings.

Mother filed an opposition, denying any intent to abandon minor. She contended that stepmother had no personal knowledge regarding various facts stepmother alleged in her declaration, and that stepmother was " 'throw[ing] mud' " with allegations having nothing to do with the issue of terminating parental rights. Mother acknowledged she did not follow proper legal procedures before, explaining she was fleeing domestic violence and did not understand how to navigate the family court system. She indicated she loves minor, raised him in the early years of his life, and wants visitation and a relationship with minor. She further indicated stepmother and father made efforts to cut her out of minor's life, such as by not accepting or facilitating calls. Mother claimed she paid child support through April 2020, but became unemployed during the pandemic and resumed paying child support after getting a new job. Though she had been saving money to hire an attorney to file a request for visitation, stepmother filed her petition to terminate mother's parental rights before mother could do so. Accompanying mother's opposition and later filings were text messages from August 2021 between mother and father, and a printout showing mother's child support payments.

In August 2022, the trial court appointed separate counsel for minor. At a bench trial on June 14, 2023, the parties stipulated to the admission of a report summarizing child support payments. Four witnesses testified, as follows.

Father testified the court had granted him sole legal and physical custody of minor in February 2019, with no visitation to mother. Father obtained physical custody of minor in March 2019, after mother had taken minor to the East Coast in violation of the court's orders. After returning to California, mother initially called minor daily, but less frequently thereafter. She stopped calling around July 2019, though she called once in November 2019. After November 2019, mother made no contact until August 2021. Father arranged it so that mother would not call him; instead, she was supposed to call his mother (the paternal grandmother) in order to talk to minor. To father's knowledge, his mother never stopped answering mother's phone calls. Father tried calling mother but did not have the right number. Mother reached out in December 2021, after stepmother filed her petition, and initially called or sent text messages every day. Subsequently, however, she sent text messages only once or twice a month asking about minor. Father did not have a problem with mother's requests to speak with minor, but he is concerned because minor does not know who mother is. Father wants mother to take a "parenting class on the effect that a missing parent has on a child and then get a psych eval, and that's it." Mother apparently provided father a picture of a certificate showing she took a parenting class in 2022, but father indicated the certificate did not show the parenting class was aimed at the effects of "being a missing parent."

Father further testified that mother did not provide child support from March 2019 to early November 2019, and during Covid from April 2020 to

4

December 2021, but now she does provide support.  Father indicated he and his family have relocated to Texas.  Minor knows stepmother as his mother, but minor also knows and loves mother's family, some of whom live in California.  Minor, who was still very young, had not yet asked who mother's family members are in relation to him, and father is not sure what he and stepmother would say to minor, but they would eventually tell him everything.

Mother testified on her own behalf as follows.  Mother was minor's primary care giver from the time he was born in late 2016 until March 2019.  She and minor had a strong bond, and minor has a close relationship with mother's family and saw them regularly until he and father moved to Texas.

Starting in March 2019, mother had phone contact (voice and video calls) with minor, facilitated by father's mother.  After mother moved to the East Coast, she changed her number and did not give her number to father because members of his family were harassing her.  Instead, she contacted father's mother which she could do via "apps."[3]  In September 2019, calls were limited to between 3:00 and 4:00 p.m. because minor was either sleeping or "busy," and by March 2020 father's mother stopped allowing or facilitating calls.  Mother felt discouraged and stopped attempting regular contact.  She experienced a "huge depression" because of what she went through with father.  She did not file a Request for Order when contact stopped because kidnapping charges were pending against her; following the advice of a court-appointed attorney, she waited to request a contact order until after those charges were cleared from her record in January or February 2021.  The attorney also informed her she had an active arrest warrant in California.

---

[3]   Mother testified she still has not given father her phone number out of fear, but will do so if needed to co-parent.

5

Mother did not deal with the criminal charge sooner because she was struggling financially and had no attorney though she needed one to help her navigate the court system. Recently, mother has been trying to contact father weekly to speak to minor. Father and stepmother have not allowed her to speak to minor, as they want her to first get a psychological evaluation or see a counselor.

Mother indicated her paycheck was garnished for child support, but then she became unemployed and financially unstable starting in March 2020 due to the pandemic. She received unemployment benefits for a limited time, but the benefits went toward her bills and rent; after her unemployment benefits ran out, she applied for a "Covid relief bill" to cover rent because she was in arrears. She got a new job in August 2021, and initially did not realize her checks were not being garnished. She resumed paying support in December 2021. Mother now works two jobs to pay more support.

Mother testified that she deeply regrets her prior violation of the trial court's custody order and explained she had been afraid because father threatened to take minor from her if she did not want to be with father. At the time, mother was unfamiliar with the court system. She never intended to abandon minor and wants her parental rights to remain in place. She loves minor very much, wants to re-establish their relationship, and will soon file a Request for Order to reconnect with minor.

Lorraine Gibbons, mother's aunt, testified she has a close relationship with minor and visited him numerous times over the years. She recalled seeing minor at father's home in 2019 and hearing minor say " 'Mom, mom, mom' " when mother called during Gibbons's visits.

In rebuttal, stepmother testified she was present for every conversation and never heard father telling mother "that she would pay." Stepmother did not personally observe father's family harass mother on social media. Stepmother testified mother's calls with minor—who was very young—were very short.

Ultimately, the trial court denied stepmother's petition to terminate mother's parental rights. The court found that stepmother did not meet her burden to show that mother intended to abandon minor, under either the "clear and convincing evidence" standard or the preponderance of the evidence standard. Based on the record, the court determined that mother's failures to pay support and to communicate with minor during certain periods did not establish an intent to abandon. This appeal followed.[4]

## DISCUSSION

Section 7822 provides a "mechanism for terminating parental rights based on a parent's voluntary abandonment of a child." (*In re Aubrey T.* (2020) 48 Cal.App.5th 316, 325 (*Aubrey T.*).) The statute provides a proceeding to terminate parental rights may be brought if "[o]ne parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child." (§ 7822, subd. (a)(3).) A proceeding under section 7822 is appropriate " 'where three main elements are met: (1) the child must have been left with another; (2) without provision for support or without communication from the parent for the statutory period; and (3) with the intent on the part of the

_____

[4]    After she filed her notice of appeal, stepmother filed a petition for writ of supersedeas and request for immediate stay of child custody and visitation proceedings initiated by mother following the decision in this case. We denied both the petition and the request.

7

parent to abandon the child.' [Citations.] A trial court's finding of abandonment must 'be supported by clear and convincing evidence.' (§ 7821.)" (*Aubrey T.*, at p. 326.)

Section 7822, subdivision (b), provides that "[t]he failure . . . to provide support, or failure to communicate is presumptive evidence of the intent to abandon. If the parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent or parents." Case law explains " '[t]he effect of such a presumption is that "when the party against whom such a presumption operates produces some quantum of evidence casting doubt on the truth of the presumed fact, the other party is no longer aided by the presumption. The presumption disappears, leaving it to the party in whose favor it initially worked to prove the fact in question." [Citation.]' [Citation.] Accordingly, when a party challenging the existence of section 7822's presumption of an intent to abandon presents evidence of its nonexistence, the presumption disappears and the court must find the requisite intent 'without regard to the presumption' and 'with no change in the allocation in the burden of proof.' " (*Aubrey T.*, *supra*, 48 Cal.App.5th at p. 327.)

" ' " 'In order to constitute abandonment there must be an actual desertion, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the same.' " ' [Citation.] The parent need not intend to abandon the child permanently; it is sufficient the parent had the intent to abandon the child during the statutory period. [Citation.] ' "[The] question whether such intent to abandon exists and whether it has existed for the statutory period is a question of fact for the trial court, to be determined upon all the facts and

8

circumstances of the case." ' " (*In re E.M.* (2014) 228 Cal.App.4th 828, 839 (*E.M.*), italics omitted.)

We begin by addressing stepmother's argument under the following heading in her opening brief: "Trial court erred in using the preponderance of the evidence standard of proof." (Capitalization omitted.) Under this heading, stepmother asserts, in full: "Section 7821 states, a finding pursuant to this chapter shall be supported by clear and convincing evidence. However[,] trial court [*sic*] held stepmother did not meet her burden by 'clear and convincing evidence or even by preponderance of the evidence.' [¶] Preponderance of the evidence is a higher, improper burden of proof."

The contention is unclear. Stepmother does not appear to contest that the clear and convincing evidence standard applied, but perhaps argues the trial court should have applied the preponderance of the evidence standard because, in her view, it is a more rigorous standard. We cannot agree. It is well established that the clear and convincing standard is the more rigorous of the two standards. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 997–998 (*Conservatorship of O.B.*).) In any event, the court determined that stepmother failed to meet her burden under both standards.

Next, stepmother contends the trial court "failed to apply the burden-shifting doctrine." (Capitalization omitted.) On this score, stepmother argues that she met her burden of proving mother intended to abandon minor, and that mother provided no evidence to rebut that intent. This appears to be, in essence, a claim that substantial evidence did not support the court's finding that mother did not intend to abandon minor. We are not persuaded.

The substantial evidence standard is highly deferential. " ' "When a trial court's factual determination is attacked on the ground that there is no

9

substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . .” ’ ” (*People v. Semaan* (2007) 42 Cal.4th 79, 88.) “ ‘Substantial evidence is evidence that is “of ponderable legal significance,” “reasonable in nature, credible, and of solid value,” and “ ‘substantial’ proof of the essentials which the law requires in a particular case.” ’ [Citation.] The testimony of a single witness may constitute substantial evidence as long as it is not physically impossible or inherently improbable. [Citations.] [¶] In exercising substantial evidence review, an appellate court does not evaluate the credibility of the witnesses but defers to the trier of fact. [Citations.] Similarly, the court does not reweigh the evidence, but will uphold a judgment that is supported by substantial evidence even if substantial evidence to the contrary also exists.” (*DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 381–382.) “[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the [reviewing] court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof.” (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1005.) “ ‘[A]ll evidence must be viewed most favorably to [the prevailing party] and in support of the order.’ ” (*E.M.*, *supra*, 228 Cal.App.4th at p. 839.) “It is the appellant’s burden on review to show that the evidence is insufficient to support the trial court’s findings.” (*Ibid.*)

In this case, mother testified she loves minor very much and never intended to abandon him. Though she testified she had not attempted to contact minor from around March 2020 until around August 2021 when she

10

spoke to father, she explained that minor's paternal grandmother—who facilitated all calls between mother and minor—ceased allowing or facilitating the calls by early 2020. Mother testified she felt discouraged and stopped attempting contact regularly, and also that she went through "a huge depression" because of what had occurred between her and father. Mother did not file a Request for Order when contact stopped because kidnapping charges and an active arrest warrant had been pending against her in California, and a court-appointed attorney advised her she could not request a contact order until those were cleared off her record, which occurred in January or February 2021. She indicated she did not deal with the abduction charge sooner because she was struggling financially, had no attorney, and needed an attorney to help her navigate the court system. Mother even started a "GoFundMe" to try to raise the funds. This testimony supports the trial court's determination that mother had no intent to abandon minor.

Likewise, the evidence and testimony from both father and mother establish that mother has paid and does pay child support. Mother acknowledged there was a period when she stopped paying child support. She explained, however, that this was due to her losing her job and becoming financially unstable during the COVID-19 pandemic, and that she has since resumed paying support and is even working two jobs so that she can pay more. Again, this supports the conclusion that mother had no intent to abandon minor. There appears no reason why the trial court could not properly take into account all these circumstances in determining that mother's failure to pay support for a period of time did not reflect an intent to abandon. (*In re H.D.* (2019) 35 Cal.App.5th 42, 53 (*H.D.*) ["It is also undisputed mother was unemployed during the months she failed to pay child support and was therefore unable to comply with the support order. A

11

parent's failure to support a child when they do not have the ability to do so does not, by itself, prove intent to abandon."].)

We conclude that, viewed as a whole, the record contains substantial evidence from which the trial court could have made a finding of high probability that mother had no intent to abandon minor. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1005.) Having so concluded, we need not and do not address stepmother's contention that there is substantial evidence showing that mother " 'left' " minor with father. We take a moment, however, to address some of stepmother's other contentions.

Stepmother contends substantial evidence does not support the "trial court's 'best interest' decision." (Underlining omitted.) In making her argument, stepmother focuses on the evidence of her bond with minor and the home she and father provide for him.

At the hearing, the parties presented no argument concerning minor's best interests and requested no explicit ruling on the issue. Assuming the issue has been properly preserved, we reject it. "In ruling on a section 7822 petition, the court is required to act in the best interests of the child. (§ 7890.)" (*E.M.*, *supra*, 228 Cal.App.4th at p. 847.) Here, the trial court's implicit finding that its decision was in minor's best interests is supported by the evidence that mother loves minor, that she was his primary caretaker for years after he was born and had a strong bond with him, that she is desirous of reestablishing their relationship, and also that she did not intend to abandon him. We note, as well, the recognized bond between natural parents and their children. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 848, citing *Lehr v. Robertson* (1983) 463 U.S. 248, 256; *In re George G.* (1977) 68 Cal.App.3d 146, 165.) Stepmother's argument, which mainly focuses on the

evidence concerning her own bond with minor, amounts to a request that we reweigh the evidence, which we cannot do.

Stepmother also argues that a "parent's failure to provide [support] or communicate with children while they address personal issues is not a rebuttal to presumptive intent." But case law recognizes the propriety of considering the circumstances surrounding a parent's lack of communication or financial support when determining whether a parent intended to abandon a child. (E.g., *H.D.*, *supra*, 35 Cal.App.5th at pp. 45–47, 52–53 [reversing termination of parental rights where the mother left her children in the father's custody and did not contact or financially support the children for over a year so she could deal with her addiction issues].)

The cases that stepmother cites—*Adoption of A.B.* (2016) 2 Cal.App.5th 912 (*A.B.*), *Adoption of Allison C.* (2008) 164 Cal.App.4th 1004 (*Allison C.*), and *Rowan v. Kirkpatrick* (2020) 54 Cal.App.5th 289 (*Rowan*)—do not support the categorical conclusion that parents who fail to communicate or provide support because they are dealing with personal issues cannot overcome the presumption of intent to abandon. First of all, *Rowan* has nothing to do with section 7822 and provides no support for stepmother's position.[5] Second, though *A.B.* and *Allison C.* affirmed orders terminating parental rights based on presumptive abandonment, they acknowledged the governing principles that " ' "questions of abandonment and of intent . . . are questions of fact for the resolution of the trial court" ' " and that appellate courts may not re-evaluate credibility or reweigh evidence. (*A.B.*, at pp. 922–

_____

[5] Stepmother also cites to *Rowan* in arguing the trial court abused its discretion "by finding COVID-19 rebuts presumptive intent." This argument is unclear and unsupported by record citations. The court does not appear to have made a finding that the COVID-19 pandemic rebutted the presumption of intent to abandon.

923; *Allison C.*, at pp. 1010–1011, 1016.)  Finally, to the extent stepmother attempts to analogize this case to the parental terminations found appropriate in *A.B.* and *Allison C.*, the facts in those cases are amply distinguishable.  (*A.B.*, *supra*, 2 Cal.App.5th at pp. 915–918, 923–924 [father never made any serious efforts to visit with or even inquire about child until she was five years old]; *Allison C.*, *supra*, 164 Cal.App.4th at pp. 1012–1014 [though incarcerated on and off, father failed to seek custody or care for the child once she was about seven months old, failed to communicate with the child for over three years, and essentially failed to support child for over three years].)

Stepmother further claims the trial court abused its discretion by considering mother's conduct or payments outside of the "statutory period" (the one-year period set out in section 7822, subdivision (a)(3)) when deciding whether mother acted with intent to abandon.  Stepmother cites no authority supporting this argument, and case law is to the contrary.  (E.g., *H.D.*, *supra*, 35 Cal.App.5th at p. 52 [indicating "weightiest evidence of intent . . . was mother's actions" "[a]*fter* becoming and remaining sober," i.e., after the period of her alleged abandonment], italics added.)  There appears no reason why a parent's actions outside the statutory period cannot, in appropriate cases, speak to their intent during it.  The authorities that stepmother relies on— *A.B.*, *supra*, 2 Cal.App.5th 912, *Allison C.*, *supra*, 164 Cal.App.4th 1004, *E.M.*, *supra*, 228 Cal.App.4th 828—do not suggest the existence of a categorical prohibition on considering a parent's actions outside of the statutory period.

Stepmother also claims the trial court erroneously believed the intent to abandon must be permanent.  In support, stepmother points to the court quoting *E.M.* for the proposition that " ' " 'In order to constitute abandonment

there must be an actual desertion, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the same.' " ' " (*E.M.*, *supra*, 228 Cal.App.4th at p. 839 italics omitted.)  This is meritless.

Setting aside the fact that stepmother made no objection on this ground below, we note the same paragraph in *E.M.* clarified that the foregoing passage was not requiring a showing of an intent to permanently abandon. Indeed, the *E.M.* court continued:  "The parent need not intend to abandon the child permanently; it is sufficient the parent had the intent to abandon the child during the statutory period." (*E.M.*, *supra*, 228 Cal.App.4th at p. 839.)  The record discloses no reason to believe the court below misunderstood the import of this passage in *E.M.* or otherwise misapplied the law.  (*People v. Thomas* (2011) 52 Cal.4th 336, 361 ["In the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law' "].)  To the extent stepmother argues the court abused its discretion by citing to *E.M.* because that case was factually distinguishable, the record plainly shows the court cited *E.M.* for its recitation of general legal principles and did not analogize the instant facts to those in *E.M.*

In closing, we note we have reviewed stepmother's remaining contentions and conclude that none warrants a reversal.

## DISPOSITION

The order denying stepmother's petition to terminate mother's parental rights is affirmed.

15

_____
Fujisaki, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Petrou, J.

*A. D.R. v. Z. M.G.* (A168489)

16