Filed 8/31/22  Adoption of C.E. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| Adoption of C.E., a Minor. | H047164, H047355 (Santa Cruz County Super. Ct. Nos. 17FL00567, 18FL01492) |
| B.M. et al., <br><br> Petitioners and Appellants, <br><br> v. <br><br> C.E. et al., <br><br> Objectors and Respondents. | |

B.M. and M.M. (collectively the Ms) were appointed guardians of C.E., a minor.[1] They appeal the trial court's orders denying their petition to free C.E. from the custody and control of his biological father, J.E. (Father), under Family Code section 7822 or to terminate his parental rights under Probate Code section 1516.5.  They also appeal the trial court's order dismissing their petition to adopt the child.[2]

The Ms contend that the trial court erred in finding that Father did not voluntarily leave the child with intent to abandon him pursuant Family Code section 7822.  (Fam. Code, § 7822, subd. (a).)  The Ms further claim that the trial court erred when it denied

---

[1] We refer to C.E., the parties and other witnesses by their initials or by their relationship to the child to protect his privacy.

[2] This court ordered the appeals from these orders to be considered together for purposes of record preparation, briefing, argument and disposition.

their petition to terminate Father's parental rights under Probate Code section 1516.5. They assert that the trial court improperly relied on a Family Court Services investigation report that both applied the wrong legal standard and failed to comply with statutory requirements. C.E., through minor's counsel, reiterates or joins in each of these arguments.

We conclude that the trial court abused its discretion when it determined that Father did not leave C.E. with the Ms with the intent to abandon him. We will reverse the trial court's orders and remand the matter to the trial court with instructions to conduct further proceedings.

## I.     FACTUAL AND PROCEDURAL HISTORY

We are acquainted with the litigation history related to the care and custody of C.E., having previously determined in *Guardianship of C.E.* (2019) 31 Cal.App.5th 1038 that the trial court was required to consolidate guardianship and adoption proceedings to facilitate a full inquiry into available long-term placement options for the child. The appeal before us addresses the orders issued by the trial court subsequent to the issuance of that opinion.[3]

### A.  *The Circumstances Leading up to the Guardianship*

C.E. lived with his parents until he was 14 months old.[4] While C.E.'s mother was alive, her family (including C.E.'s maternal aunts S.H. and T.W.) and friends (including the Ms) were actively involved in C.E.'s life and often cared for him.

---

[3] We include facts that pre-date our opinion in *Guardianship of C.E.* where the trial court considered such evidence in its decision to deny the Family Code section 7822 petition. We summarize the facts, viewed in favor of the challenged order as required on appeal. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 423.)

[4] At that time, the mother had custody of her older son from another relationship (T.T.), Father had sole custody of his two older children from another relationship and this blended family lived together in the house.

In August 2015, C.E.'s mother died in a drowning accident while vacationing with her extended family, C.E. and the Ms.  Shortly thereafter Father moved with C.E. into his grandmother's house in another town.  He allowed extended maternal family members and the Ms to have liberal and frequent visits with the child, consistent with Mother's practice when she was living.

Mother's family became concerned about Father's parenting of C.E., due in part to B.M.'s reports that Father was abusing substances and not properly caring for C.E.  They contacted a lawyer to make other custodial arrangements for C.E.  Although they originally contemplated that the maternal grandparents or S.H. and her husband, A.H. (collectively, the Hs), would seek to be appointed as C.E.'s guardians, the lawyer advised them there would be a greater likelihood of success if the Ms did so.  The express understanding of everyone involved was that the Ms would become C.E.'s guardians temporarily and that actual custody of C.E. would continue on a shared basis with maternal family members and certain friends.

When Father thereafter was arrested for domestic violence against the mother of his other two children and she obtained a restraining order against him, the Ms proceeded with the plan to seek guardianship of C.E.  Fearing that Father would flee with C.E. if he knew about their plan, B.M. told him she wanted to have C.E. for an extended family gathering over a weekend in April 2016.  On April 16, 2016, after the Ms collected C.E. from Father, the attorney filed a guardianship petition requesting that the Ms be appointed legal guardians of C.E., accompanied by a request that the court appoint the Ms as temporary guardians on an ex parte basis, without notice to Father.

S.H. and other maternal family members, as well as close friends, submitted declarations in support of the Ms' guardianship petition in which they described serious concerns with Father's parenting of C.E.  The Ms submitted their own supporting statements, in which they represented that C.E. had lived with them since his mother's death in August 2015.

## B. *The Guardianship Proceedings*

In April 2016, at the ex parte hearing on the petition, the probate court[5] waived notice to Father and appointed the Ms as C.E.'s temporary guardians pending a hearing. Father discovered what had happened the following Monday, when he called to pick C.E. up from the Ms. He was upset and felt that C.E. had been "ripped away," essentially "kidnapped," from him.

Father appeared at two court hearings on May 13 and 16, 2016, gathered letters from his family members, and introduced testimonial evidence regarding his parenting of C.E. in opposition to the Ms' guardianship petition. At the hearing on the petition on June 17, 2016, Father requested a continuance so that he could access relevant documents and retain counsel to oppose the petition. The probate court denied Father's requests. Father left the courtroom at the recess. Thereafter he did not appear in court for any guardianship proceedings between July 2016 and December 2018.[6] The probate court granted the Ms' guardianship petition on June 17, 2016, and issued an order directing Father to take steps necessary to transfer C.E.'s public benefits to them. Father was authorized to have professionally-supervised visitation with C.E. once a week for two hours. The restrictions on visitation were consistent with those imposed in the family law proceedings related to Father's other children as a result of his criminal conviction for domestic violence.

Sometime after the June 17, 2016 hearing, Father received a copy of the guardianship order and reached out to B.M. to arrange visitation. He contacted her several times before she finally responded. B.M. told Father that he should not

---

[5] We distinguish between the judges in the probate and adoption divisions of the trial court to clarify the unusual procedural history that resulted in the issuance of our opinion in *Guardianship of C.E.*, *supra*.

[6] Father later testified that the judge stated he had "made the decision, before hearing anybody, that he wasn't going to change his mind, and that was his decision, final decision. And after that I did not show up. . . ."

communicate with her but instead would be required to work with her attorney to make visitation arrangements.[7]  Subsequently, B.M. declined to answer Father's calls or respond to his voicemail messages.  Father did not attempt to arrange visitation through the attorney.

### C.  The Hs' Petitions to Remove and Replace the Ms as C.E.'s Guardians and to Adopt C.E.

After the Ms were appointed as C.E.'s guardians, he continued to live with them and the Hs on a shared basis.  Father, who had been unemployed since 2015, did not provide financial support to the Ms for the child after April 2016, or attempt to send him gifts or cards, and the Ms did not request support from Father.  Father did not contact the Ms to inquire about C.E.'s welfare, but was in touch with S.H., and spoke to C.E. on the telephone at least once when C.E. was visiting maternal relatives.

In August 2016, the Ms stated their intent to adopt the child.  Their efforts were opposed by the Hs, who desired that maternal relatives share responsibility for raising C.E. consistent with past practice.  On December 14, 2016, the Hs filed petitions to remove and replace the Ms as C.E.'s guardians.  Other maternal family members supported these petitions, which the Ms opposed as contrary to C.E.'s best interests.  On January 10, 2017, Father executed a consent to appointment of a guardian and waiver of further notice wherein he nominated the Hs as guardians for C.E. and supported their petition for removal and replacement of the Ms as guardians.

In April 2017 Father again reached out to two court-authorized visitation supervisors to oversee his visits with C.E.  Each of them declined to supervise visits after talking to B.M., who indicated Father would not be consistent with visitation and his visits would negatively affect C.E.

---

[7] The court received evidence that B.M. saw Father on her lawn staring at her house, and thus considered obtaining a restraining order.  As a result, she wanted no contact with Father and directed him to her attorney.  The court made no findings on this point.

In January 2017, the probate court investigator filed her report on the Hs' petition to remove the Ms as guardians after visiting the Ms and C.E. in the Ms' home. She indicated that the Ms had bonded with C.E. and were providing him a safe home environment. The probate court appointed counsel for C.E. The court set the guardianship removal petition for trial.

On April 26, 2017, the Hs filed a petition for an independent adoption of C.E. in the family court. The application requested that the court terminate Father's parental rights and attached a waiver by Father of the right to further notice in the proceedings "if and only if, [C.E.] is to be adopted by [the Hs]." Father later testified that he was distressed about having to forego his parental rights to permit the adoption and cried after signing the waiver, but felt that C.E.'s adoption by the Hs would be the only way he would have the opportunity to remain a part of his son's life.

The trial court assigned the Hs' adoption petition to the same judge who was to hear their petition to remove and replace the Ms as guardians. In May 2017, the probate court denied the Hs' request to consolidate their guardianship case with the adoption case.[8] In November 2017, the probate court conducted a contested evidentiary hearing on the Hs' amended petition to remove the Ms as C.E.'s guardians and denied the Hs' petition, finding that they had not proven that removing the Ms as guardians was in C.E.'s best interests.[9] Father did not participate in the hearing.

---

[8] The Hs thereafter filed a timely peremptory challenge under Code of Civil Procedure section 170.6 to the probate judge hearing their adoption petition. The Hs' appeal of the probate court's order denying their motion to consolidate the guardianship and adoption proceedings resulted in our issuance of *Guardianship of C.E.*, *supra*. The detailed procedural history of this aspect of the case is not relevant to our determination here.

[9] Shortly thereafter, A.H. passed away unexpectedly; since then, S.H. has participated in these proceedings individually. (*Guardianship of C.E., supra,* 31 Cal.App.5th at p. 1046, fn. 5.)

***D. The Proceedings on S.H.'s Adoption Petition and the Ms' Petitions Seeking to Terminate Father's Parental Rights and to Adopt C.E.***

In June 2018, the California Department of Social Services (the Department) filed a report on S.H.'s petition to adopt C.E. Although the investigator opined that C.E. and S.H. had a bonded relationship, due to restrictions on contact between aunt and child imposed by the probate court's most recent visitation order, she had been unable to see C.E. with S.H. more than once and thus had had insufficient opportunity to make a recommendation in favor of adoption. Given the circumstances, the investigator felt compelled to recommend that the court deny S.H.'s adoption petition but expressed "hope[] that the [Ms] would allow more visitation between [S.H. and C.E.]" in the future.

The investigator's hope was unfulfilled and in an August 2018 follow-up letter, the Department informed the court that the circumstances remained unchanged and requested that the court set a hearing to resolve S.H.'s adoption petition. The adoption court appointed a therapist for C.E. and set an order to show cause hearing why the adoption petition should not be dismissed. S.H. objected that the probate court's orders had significantly hampered her visits with C.E. and the Department had been unable to fully consider her petition. She urged the court to set an expedited evidentiary hearing. The adoption court ordered the Ms to allow the Department's investigator access to C.E. in S.H.'s home and to release C.E.'s medical records so the Department could perform the evaluation needed to complete its adoption assessment. In November 2018, the Ms filed their own petition to adopt C.E., along with a petition to declare C.E. free from Father's custody and control under Family Code section 7822 or to terminate his parental rights under Probate Code section 1516.5.

On December 10, 2018, the Department filed its completed report relating to S.H.'s adoption petition. Based on a comprehensive psychosocial evaluation, the investigator concluded that S.H. was a suitable adoptive parent, who "was quite attached to [C.E.] and absolutely dedicated to his well-being." She recommended that the court

7

grant S.H.'s adoption petition if the guardianship was resolved, as adoption would be in C.E.'s best interests. The report indicated that Father signed a waiver of his right to further notice, and stated, "[Father] reportedly agrees with the adoption and wishes the minor to be with the petitioner." The adoption court appointed counsel for Father and confirmed his authorized visitation. On January 18, 2019, at an initial hearing regarding the termination of parental rights petition, Father appeared and confirmed his consent to C.E.'s adoption by S.H., but reiterated that he would not consent to adoption by the Ms.

In March 2019, the Department filed its report relating to the Ms' adoption petition. The investigator observed that the Ms were providing a loving and stable home for C.E., who appeared to be thriving, and that they "provide[d] an avenue by which [C.E.] can enjoy and maintain relationships with all of the vital people and family members in his life, biological or psychological." The investigator concluded that an appropriate parent-child relationship was well-established between C.E. and the Ms and "it would appear to be in the best interest of the child to have the adoption completed," if he was legally freed for adoption.

### E. Father's Visitation in 2019

On January 31, 2019, this court issued its opinion reversing the probate court's 2017 denial of the Hs' motion to remove the Ms as guardians, concluding that the court erred when it denied the Hs' request to consolidate the guardianship action with their adoption petition. (*Guardianship of C.E., supra*, 31 Cal.App.5th 1038, 1055.) We remanded the matter to the trial court with directions to consolidate the guardianship and adoption proceedings, assign the consolidated cases to the adoption court and vacate all prior orders in the guardianship proceeding related to the Hs's petition to remove the Ms as guardians of C.E. (*Id.* at pp. 1057-1058.) We indicated that consolidation of the guardianship and adoption cases would promote a "full inquiry into all of the available long-term placement options to serve C.E.'s best interests and to consider them

8

contemporaneously, including both retention of the guardianship and granting the adoption." (*Ibid.*)

On February 5, 2019, C.E.'s counsel filed an ex parte application in the trial court based on the lack of contact between C.E. and Father, seeking orders requiring C.E. to attend at least two sessions with his therapist, as well as other conditions, before recommencing visitation with Father. In February 2019, Father made efforts to set up visits with C.E., contacting another authorized visitation supervisor, who declined to oversee visits after speaking with B.M. Ultimately Father arranged that C.E.'s therapist would act as a visitation supervisor. The visit was positive and C.E. recognized Father as his parent.

Father's "difficulties in arranging [visits]" continued, even after his attorney had "extensive communication" with the Ms' lawyers. Finally, in April and May 2019, Father had some successful professionally-supervised visits with C.E. C.E. appeared to enjoy his time with Father, although he initially struggled when transitioning into his visitation time. Father and son played games, gardened, and enjoyed arts and crafts. The supervisor reported that Father was very encouraging to C.E., and that the child at times indicated that he did not want to leave or wanted to stay overnight with Father. C.E.'s time with Father was positive.

### F. Trial and Decision on the Petition to Terminate Father's Parental Rights

Trial on the Ms' petition to terminate Father's parental rights commenced in June 2019. In addition to hearing percipient witness testimony about the underlying facts and circumstances of this case from the parties as described *ante*, the court heard testimony from various experts and considered the reports of the agency investigators who assessed whether C.E. should be adopted.

In March 2019, the Family Court Services investigator filed her report regarding the Ms' petition to terminate Father's parental rights. In her report, she acknowledged

that the matter was not typical and involved "many complicating factors." She recommended that the adoption court deny the Ms' termination petition "at this time."

In her testimony, the investigator opined that Father did not intend to abandon C.E., noting that after the death of the child's mother, Father had set up a support network that included maternal relatives and family friends. "I thought throughout the Court process[,] [Father] made it very clear that there was no intent to abandon the child, because he came to court in May [2016] saying that he did not agree. In June [2016], he asked for a continuance and for counsel and to secure documents, and he was denied. And then, six months later, he supported the [Hs] when they asked . . . to be [C.E.'s] guardians, he supported that. And then, in April 2017, he supported [the Hs' request to adopt C.E.] So throughout the life and context of the case . . . there [were] demonstrated efforts by the father that he had no intention to abandon [C.E.] by making a temporary plan and a long-term plan."

The court heard expert testimony regarding C.E.'s attachment and bonding to the parties. The Ms presented Dr. Frederica Conrad as an expert on parent-child attachments and attachment disruption, who testified that, based on her observations of C.E. with the Ms, he was attached to them as parental figures. She opined that removing C.E. from the Ms' custody would be a "tremendous loss" to him but also indicated that the existence of several other day-to-day attached relationships would be good for him and would be a "buffering agent" against the effects of the loss of the Ms as his primary caregivers. The Ms also offered C.E.'s therapist, Bethany Kientzel, as an expert on child development. She opined that B.M. was C.E.'s most important attachment, but admitted she did not know anything about the relationship between C.E. and S.H. Ms. Kientzel also testified that a child can have positive attachments with multiple persons and that such attachments are beneficial to the child. She observed that C.E.'s behavior had improved since the court had stabilized the parties' visitation schedule.

S.H. called Dr. Maryann Rowe as an expert in pre-adoption psychological assessment, bonding and forensic child custody evaluations. Dr. Rowe testified that the separation of a parent and his child for several years would not necessarily disrupt the bond between them, particularly if the quality of their time together and the parent's sensitivity to the child after regaining contact were positive. Dr. Rowe also opined Father's contacts with C.E. should be maintained.

The adoption court denied the Ms' petition to terminate Father's parental rights under Family Code section 7822. The court concluded that the Ms had failed to establish by clear and convincing evidence that Father intended to abandon C.E. as required by Family Code section 7822, subdivision (a)(2), noting that the temporary guardianship was granted without notice to Father, he objected to the guardianship at hearings in May 2016 and he unsuccessfully moved for a continuance of the June 17, 2016 hearing in order to hire counsel. The court determined that within six months of receiving notice of the June 17, 2016 order appointing the Ms as C.E.'s guardians, Father joined in S.H.'s petition to remove and replace the Ms as C.E.'s guardian.

The court also made numerous factual findings. The court found that B.M. and S.H. materially misrepresented and/or exaggerated information proffered in the initial temporary guardianship proceedings. The court determined that B.M.'s testimony that she would support future visitation between Father and C.E. was not credible because the Ms "have consistently objected to orders expanding visitation," but S.H. sought to facilitate visitation between C.E. and Father during the proceedings. The court recognized that Father was subject to a September 2016 domestic violence restraining order, that he minimized the domestic violence incident in his testimony, and that his visitation was restricted to supervised contact with C.E. consistent with the family court custody orders issued for Father's other children as a result of his criminal conviction for domestic violence. The court noted that Father had been unemployed since 2016 and had provided no financial support to C.E. since April 2016. Father made attempts to schedule

11

visitation with C.E. "sometime in 2016" and again in April 2017, but B.M. told him to speak to her attorney, and the visitation supervisors he contacted would not agree to work with him based on information provided to them by B.M. The court determined that C.E. was bonded to both the Ms and Father. The court determined that terminating Father's parental rights was not in C.E.'s best interests.

The adoption court also denied the Ms' petition to terminate Father's parental rights under Probate Code section 1516.5, determining that the significant lapse of time attributable to the earlier appeal from the probate court's order denying consolidation could not be considered as part of the two year period required to terminate parental rights under the statute and that, even if that time could be considered, applying the statute to Father would violate his due process rights as described in *Guardianship of Ann S.* (2009) 45 Cal.4th 1110 (*Ann S.*) and *In re Charlotte D.* (2009) 45 Cal.4th 1140. The adoption court entered a formal dismissal of the Ms' adoption petition based on its denial of their petition to free C.E. for adoption.

The Ms filed a timely notice of appeal from the orders denying their petition to terminate Father's parental rights (appeal No. H047164) and the dismissal of the petition for adoption (appeal No. H047355).

## II. DISCUSSION

### A. *Proceedings to Terminate Parental Rights Generally*

There are several types of proceedings that may result in a termination of parental rights over the parent's objection or without parental consent, including proceedings under the Family Code (see Fam. Code, §§ 7822, 8604, subds. (b) & (c)), proceedings under the Probate Code (Prob. Code, § 1516.5) and proceedings under the Welfare and Institutions Code (Welf. & Inst. Code, § 300 et. seq.). These statutes address "a complex group of interrelated, but perhaps conflicting, interests among which are those of (1) the parent and child in a continuing familial relationship; (2) the parent in preserving the integrity and privacy of the family unit, free of state intervention and social stigma

12

attached to either parent or child; (3) the child in a permanent, secure, stable, and loving environment; and (4) the state in protecting the child." (*In re Angelia P.* (1981) 28 Cal.3d 908, 919; *In re R.S.* (1985) 167 Cal.App.3d 946, 957.) Although a parent's right to have custody and control of his or her child is fundamental and subject to constitutional protection, it is not absolute. (*Ann S.*, *supra*, 45 Cal.4th 1110.)

## B. Family Code Section 7822

### 1. Legal Principles

Family Code section 7800 et. seq. governs proceedings to have a child declared free from a parent's custody and control. "The purpose of this part is to serve the welfare and best interest of a child by providing the stability and security of an adoptive home when those conditions are otherwise missing from the child's life." (Fam. Code, § 7800.)[10] The statutes are to be "liberally construed to serve and protect the interests and welfare of the child." (§ 7801.)

A court may declare a child free from the parent's custody and control if the parent has abandoned the child. Relevant here, section 7822 provides that abandonment occurs when "[t]he child has been left by both parents or the sole parent in the care and custody of another for a period of six months without any provision for the child's support, or without communication from the parent or parents, with the intent on the part of the parent or parents to abandon the child." (§ 7822, subd. (a)(2).) Thus, a finding of abandonment is appropriate when three elements are met: (1) the child must have been left with another; (2) without provision for support or without communication from the parent for the statutory period; and (3) with the intent on the part of the parent to abandon the child. (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1010 (*Allison C.*).)

Section 7822 also includes a presumption: "The failure to provide . . . support, or failure to communicate is presumptive evidence of the intent to abandon. If the parent or

---

[10] Subsequent undesignated statutory references are to the Family Code unless otherwise noted.

13

parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent or parents." (§ 7822, subd. (b).)

### 2. *Standard of Review*

Whether to terminate parental right lies squarely within the discretion of the trial court, and must be based on specific findings of fact. (*Adoption of A.B.* (2016) 2 Cal.App.5th 912, 924.) These findings of fact, including any finding of abandonment, must be supported by clear and convincing evidence. (§ 7821; *Adoption of Oukes* (1971) 14 Cal.App.3d 459, 466.)

On appeal, we will not disturb the decision to terminate parental rights absent an abuse of discretion. (*Adoption of A.B.*, *supra*, 2 Cal.App.5th at p. 924.) The trial court does not abuse its discretion if the order is supported by the appropriate factual findings and the findings are supported by substantial evidence. (*Ibid.*) This includes any finding under section 7822. (*Ibid.*; *Allison C.*, *supra*, 164 Cal.App.4th at p. 1010.) We review the record, as a whole, in the light most favorable to the prevailing party, to determine whether substantial evidence supports the trial court's findings. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005, 1011-1012.) The appellant bears the burden of showing that the findings are not supported by substantial evidence. (*Allison C.*, at p. 1011.)

However, even if substantial evidence supports the trial court's findings, we could still find an abuse of discretion if the court misapplies the law, bases its decision on improper criteria or uses an incorrect legal standard. (See *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435-436; *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15.) Where the trial court applies an incorrect legal standard, we review the matter de novo. (See *Adoption of A.B.*, *supra*, 2 Cal.App.5th at pp. 922, 924; *Allison C.*, *supra*, 164 Cal.App.4th at p. 1010, fn. 6.)

### 3. *Leaving the Child with Intent to Abandon*

A termination of parental rights under section 7822, subdivision (a)(2) requires that the parent leave the child in the care and custody of another person for at least six

months.  A parent "leaves" a child by voluntarily relinquishing the child to another person's care and custody or by actual desertion.  (*In re Amy A.* (2005) 132 Cal.App.4th 63, 69 (*Amy A.*).)  As the adoption court correctly concluded, Father did not initially voluntarily surrender C.E. to the Ms.  The Ms obtained temporary guardianship orders granting them custody of C.E. without notice to Father and legal guardianship orders over his express objection.  The court denied his request for a continuance to obtain counsel to assist him in the proceedings.  "[A] parent does not voluntarily abandon their parental role if . . . a court places the child in the custody of another" because such a judicial taking is inherently coercive.  (*In re Cattalini* (1946) 72 Cal.App.2d 662, 665; *In re Jones* (1955) 131 Cal.App.2d 831, 834-835.)  Under these circumstances, there is ample evidence that Father did not voluntarily relinquish custody of C.E. to the Ms and thus "leave" the child within the meaning of section 7822 at the time the court first appointed the Ms as C.E.'s temporary guardians in April 2016.

While Father did not voluntarily leave C.E. in the first instance, a parent's inaction over a significant period after an involuntary loss of custody resulting from a court order has long been recognized as a basis for terminating parental rights under the statute.  (*In re Marriage of Jill & Victor D.* (2010) 185 Cal.App.4th 491, 504-506; *Amy A.*, *supra*, 132 Cal.App.4th at pp. 69-70 [a father's failure to communicate with, visit, or support his child after a judicial order granting custody to mother provided "substantial evidence that he voluntarily surrendered his parental role and thus 'left' [the child] within the meaning of section 7822."].)  "[I]f after a child is taken against the parent's wishes that parent does not endeavor to secure the child's return but instead fails to act, their inaction can 'convert[ ]' the earlier taking into a leaving.  [Citations.]"  (*In re H.D.* (2019) 35 Cal.App.5th 42, 51-53 ["mother's attempts to contact her daughters, her diligence in treating her addictions, her attempt to regain custody in family court, and her payment of support when she was able preclude a finding of abandonment."]; *In re Jacklyn F.* (2003) 114 Cal.App.4th 747, 755-756 [appellant who fully participated in a guardianship

15

proceeding that resulted in a court order taking custody of the minor from her did not "leave" the child, and her post-guardianship conduct, "which included sending 'stacks' of letters to the minor but failing to visit her—did not constitute 'parental nonaction' amounting to leaving."].)  With respect to the placement of a child through a guardianship proceeding, section 7822, subdivision (b) provides, "In the event that a guardian has been appointed for the child, the court may still declare the child abandoned if the parent [has] failed to communicate with or support the child within the meaning of this section."  (§ 7822, subd. (b).)

The Ms contend that Father's voluntary inaction for more than six months following his departure on June 17, 2016, from the hearing on their guardianship petition constitutes "leaving" within the meaning of section 7822.  They further contend that the court both improperly calculated the six-month time period, and considered evidence outside of the time period in making its determination.  We agree.

It is undisputed that from the time Father left the hearing on June 17, 2016, until the time he signed the form nominating the Hs as guardians and consenting to their appointment on January 10, 2017, he did not take the actions necessary to establish supervised visitation with C.E., and did not provide any support for the child.  Although the trial court correctly concluded that father did "leave" the child, the court's finding that he did so for less than six months, and/or without the requisite intent to abandon C.E. is neither supported by substantial evidence, nor is legally correct.

> ### 4. *The Court Erred in Starting the Six-Month Statutory Period from the Date Father Received Notice of the June 17, 2016 Order*

The adoption court concluded that the Ms failed to prove by clear and convincing evidence that Father intended to abandon C.E. because it found that Father joined in S.H.'s petition to replace the Ms as C.E.'s guardian within six months of "*receiving notice*" of the June 17, 2016 order.  Notably, the court does not expressly state in its order the exact date it believes the six months began to run under section 7822, subdivision

16

(a)(2), only that it ran from the date Father received notice. However, in implying that it ran from the date Father got notice of the order, rather than the date he walked out of the hearing on June 17, 2016, the trial court erred.

Section 7822, subdivision (b), provides that "[t]he failure to provide . . . support, or failure to communicate is presumptive evidence of the intent to abandon." (§ 7822, subd. (b).) The statute focuses not on notice given to the parent, but on the parent's demonstrated actions to assume parental responsibilities. (*In re Aubrey T.* (2020) 48 Cal.App.5th 316, 327.) We thus conclude that the six months must run from the date Father made his last efforts regarding the child. That date is not when he received notice of the order, but when he walked out of the courtroom after being denied a continuance. There is no basis in fact or law to commence the six months from the date Father received notice of the order.

> 5. *Substantial Evidence Does Not Support the Finding that Father did not Abandon C.E. for the Requisite Six Months.*

Because the six months began to run on June 17, 2016, there is insufficient evidence to support the court's finding that Father took sufficient actions within six months to avoid the conclusion that he abandoned C.E. Six months from June 17, 2016, is *December 17, 2016*. The Hs filed their petition to change the guardianship on December 14, 2016. In the petition, the Hs indicated that they did not know if Father agreed to the request. Father did not sign the form nominating the Hs as guardians and consenting to their appointment as such until *January 10, 2017*, more than six months after he left C.E. in the Ms care and custody.

In addition to Father's joinder with the Hs' petition for removal of the guardian, the court relied on other facts to support its finding that the Ms did not prove their case, but none within the statutory timeframe. The court noted that Father did not receive notice of the ex parte temporary guardianship orders, objected to the reissuance of such orders, requested a continuance at the hearing on the guardianship petition, and was

17

denied that opportunity. However, this evidence concerns events that predate the statutory period, that commenced when Father absented himself from the June 17, 2016 guardianship proceedings. Evidence that falls outside the statutory period is not relevant to the court's determination of abandonment. (*Amy A.*, *supra*, 132 Cal.App.4th at p. 71 ["the fact that [the father] opposed the petition to terminate his parental rights is not relevant because the proper inquiry is whether he intended to abandon [the child] during the . . . statutory period before the petition was filed. [Citation.]"].)

After Father absented himself from the June 17, 2016 proceedings, there is scant evidence that he took any other action with respect to C.E. for close to seven months. On the contrary, the court found that Father provided no financial support for C.E. for the six-month period after the guardianship orders were entered. He also had no communication with C.E. during that time, sent him no cards, letters, or gifts. Despite this evidence, the court made no reference to the presumption under section 7822, subdivision (b), that such failure is presumptive evidence of the intent to abandon. (§ 7822, subd. (b).)

Father attempts to rebut this presumption by asserting that he made efforts to arrange supervised visitation with C.E. under the court order, but was thwarted by the Ms. But the adoption court found that Father did not attempt to arrange visitation with C.E. in 2016, when B.M. told him to speak with her attorney. Father testified and submitted documents stating that he made some efforts to arrange supervised visitation in 2016 and that B.M. did not respond to the supervisors or provide information to them such that they declined the service. We must defer to the adoption court's factual finding that while the Ms did not facilitate visitation between Father and C.E. or encourage it, they did not actively interfere with it. (See *Adoption of A.B.*, *supra*, 2 Cal.App.5th at pp. 922-923; *Guardianship of L.V.* (2006) 136 Cal.App.4th 481, 487.) Father also contacted S.H. regarding his difficulties in arranging visits with C.E., and spoke to C.E. on the telephone at least once while he was visiting with maternal relatives. The court did not

rely on these actions and was entitled to disregard "token efforts" Father made to communicate with C.E. (§ 7822, subd. (b).)

We note that the restrictions on Father's visitation were the product of his conviction for domestic violence, and were consistent with those imposed by the family court in proceedings related to his other children. Obtaining professional supervisors for visitation is a difficult task, but Father's voluntary actions of domestic violence resulted in those restrictions. Unlike the mother in *In re H.D.*, *supra*, 35 Cal.App.5th 42, Father did not commit himself to taking the necessary steps to obtain visitation by coordinating with the Ms' attorney, or returning to court to seek further redress.

Father argues that the evidence demonstrates that he agreed to terminate his parental rights in favor of S.H. so that C.E. could live with S.H. and Father could remain a part of his life. He cites evidence supporting the trial court's finding that there exists a bond between Father and C.E., based on the supervised visits Father had with C.E. in April 2019. As we have observed above, this evidence is not relevant to the statutory time period under consideration here. (See *Amy A.*, *supra*, 132 Cal.App.4th at p. 71.)

Nor does this evidence rebut the presumption under section 7822, subdivision (b), that he intended to abandon C.E. for the statutory period by failing to provide support to or communicate with C.E. The relevant inquiry regarding Father's intent is not whether he continued to care about C.E. after leaving him in the care of another, or whether he wanted to have some on-going role in C.E.'s life. It is whether, during the statutory period, Father intended to sever his parental relation and the obligations that arose from that relation, based on an objective measurement of his conduct. (*In re Aubrey T.* (2020) 48 Cal.App.5th 316, 327; *Adoption of A.B.*, *supra*, 2 Cal.App.5th at p. 923; *In re E.M.* (2014) 228 Cal.App.4th 828, 839; *In re Brittany H.* (1988) 198 Cal.App.3d 533, 548.)

The trial court did not cite additional evidence from June 17, 2016, to December 17, 2016, that demonstrated that Father either supported or communicated with C.E. during this period, and we discern none from our review of the record. We conclude that

substantial evidence does not support the trial court's conclusion that the Ms failed to prove that Father intended to abandon his son during the relevant statutory period under section 7822.

### 6. Conduct Post-Dating the Statutory Period Does Not Assist Father

Recognizing that the Ms filed their petition to free C.E. from Father's custody and control almost two years after the expiration of the six-month period identified by the adoption court, we asked the parties for supplemental briefing to address whether Father's conduct after the expiration of the six-month period has any bearing on the application of section 7822 in this case. Citing *Adoption of A.B.*, *supra*, 2 Cal.App.5th at pages 923-924, the Ms argue that once abandonment under section 7822 has been established, the court cannot consider post-abandonment circumstances, even if the abandoning parent subsequently established frequent and constant contact with the child. Father argues that case law does allow the court to consider conduct occurring outside of the statutory period to determine whether a parent intended to abandon a child for purposes of section 7822.

In *Adoption of A.B.*, the mother's husband sought to terminate the father's parental rights pursuant to section 7822, subdivision (a)(3), which sets forth a one-year period of abandonment. (*Adoption of A.B.*, *supra*, 2 Cal.App.5th at p. 915.) The father argued that the trial court erred in granting the petition, contending that the one-year period referred only to the year immediately preceding the filing of the petition to terminate parental rights. (*Ibid.*) The Court of Appeal concluded that while the statutory period of abandonment must occur prior to the filing of the petition terminating parental rights, there was no limitation requiring the period to occur immediately prior to the termination petition. (*Id.* at p. 919.) "We also reject [the] contention that interpreting the statute to authorize a termination of parental rights where a parent abandoned a child, but subsequently established frequent and constant contact with him or her, would be 'absurd.' In fact, the interpretation [the party] advocates would allow a parent to abandon

20

a child for many years, only to race to the courthouse to obtain visitation as soon as a new stepparent enters the picture, thereby precluding the court from terminating the abandoning parent's rights and interfering with the child's potential adoption, stability and security." (*Id*. at p. 922.) While the appellate court recognized that "[the father] may not have intended to abandon [the child] permanently and his efforts toward self-improvement were admirable, the law does not require that [the child's] life be kept in limbo based on such circumstances. In fact, doing so would not be consistent with the Legislative purpose of providing abandoned children with the stability and security of an adoptive home." (*Id*. at pp. 923-924.)

In attempting to distinguish *Adoption of A.B.* from the facts of this case, Father notes that the appellate court considered the father's conduct during a four-year period rather than relying on one specific year-long period. We are not persuaded that this distinction changes the application of the principle here. Nor does our duty to resolve conflicts in the evidence in favor of the trial court's order and indulge all reasonable inferences to uphold the decision require us to consider the evidence outside of the statutory period. While Father is correct that we do begin and end our review with a determination of whether substantial evidence supports the conclusions reached by the trial court, that determination is limited by the applicable legal standards. Section 7822, subdivision (a)(2) sets forth the statutory abandonment period the trial court was required to consider. Based on that statute, we have determined that there was not substantial evidence in the record to support the trial court's findings relative to that period. As the *Adoption of A.B.* court indicated, an interpretation of the statute allowing a parent to abandon a child under section 7822, and then later reconnect with the child to negate the abandonment would interfere with the Legislative purpose of providing abandoned

children with stability and security. (*Adoption of A.B.*, *supra*, 2 Cal.App.5th at pp. 922-924.)[11]

### C. Conclusion

The trial court erred when it denied the Ms' petition to free C.E. from Father's custody and control under section 7822 both because it incorrectly calculated the relevant time period under the statute, which was an error of law, and because it considered evidence irrelevant to that period, which could not support its findings. We will reverse the order and instruct the trial court to conduct a hearing applying the correct legal standard under section 7822 as articulated above.[12]

The adoption court dismissed the Ms' petition to adopt C.E. solely because the court denied their petition to free C.E. from Father's custody and control. We will reverse that order and remand the matter for further proceedings on the adoption petition. We note that S.H. also has an adoption petition pending. We express no opinion on the merits of either petition.

---

[11] S.H. argues that the Ms are benefitting from their delay in bringing a petition to terminate Father's parental rights and should be estopped from doing so. The Ms' decision to wait until November 2018 to file the petition to terminate Father's parental rights did not yield a different result than if they had filed earlier. The trial court lacked substantial evidence to find that they failed to meet their burden to show Father left C.E. in their care for a period of six months without support or communication and with an intent to abandon C.E. That would have been true had they filed the petition six months and one day after the June 2016 guardianship hearing. Estoppel does not apply in this case.

[12] Based on this holding, we need not consider whether Father's consent to appoint S.H. as C.E.'s guardian, or his consent to terminate his rights so that S.H. could adopt C.E. constituted evidence of his intent to abandon C.E., as we will not consider conduct occurring after the termination of the statutory six-month period. As the trial court erred in denying the Ms' petition to terminate Father's parental rights under section 7822, we need not address whether the court erred in evaluating the Ms' alternate basis for termination of Father's parental rights under Probate Code section 1516.6, or the alleged deficiencies in the investigator's report related to the Ms' petition for termination of parental rights under section 7822.

### III.    DISPOSITION

The order denying the Ms' petition to free C.E. from Father's custody and control is reversed and the matter remanded for the court to conduct a hearing applying the correct legal standard under Family Code section 7822, subdivision (a)(2) (appeal No. H047164).  The order dismissing the Ms' petition to adopt C.E. is reversed and the matter remanded to the trial court to hold further proceedings on the adoption petition (appeal No. H047355).  In the interests of justice, all parties shall bear their own costs on appeal.

_____

Greenwood, P. J.

WE CONCUR:

_____

 Danner, J.

_____

 Lie, J.

B.M. et al. v. C.E. et al.
Nos. H047164 & H047355