Filed 4/14/25

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.T., a Person Coming Under the Juvenile Court Law. | D085053 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. J519409) |
| Plaintiff and Respondent, | |
| v. | |
| W.M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Daniela A. Reali-Ferrari, Judge. Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Natasha C. Edwards, Deputy County Counsel, for Plaintiff and Respondent.

W.M. (Father) appeals from the juvenile court's October 18, 2024 dispositional order removing A.T. from the "physical custody" of M.T.

(Mother) and Father pursuant to Welfare and Institutions Code[1] section 361, subdivisions (c) and (d), respectively.  The court alternatively found, as to Father only, that it would be "detrimental" to place A.T. with him under section 361.2, subdivision (a).

On appeal, Father argues (1) section 361, subdivision (d) applies in this case because, unlike section 361.2, subdivision (a), it is "arguably the more difficult provision to satisfy" as "it expressly requires an additional showing that there are no reasonable means available to prevent removal"; and (2) clear and convincing evidence does not support the juvenile court's finding that removal of A.T. from his physical custody was necessary to protect her well-being.

The San Diego County Health and Human Services Agency (Agency) argues section 361.2 governs in this case because Father did not have physical custody of A.T. at disposition, but instead desired "to assume custody" after she was removed from Mother's sole physical custody.  (*Id.*, subd. (a).)  The Agency further argues that, regardless of which statute applies, clear and convincing evidence supports the juvenile court's dispositional order, including placement of A.T. with a relative caregiver.

As we explain, we conclude (1) section 361.2 applies in this case because Father was the noncustodial parent seeking custody and placement of A.T. under the juvenile court's continuing supervision; and (2) clear and convincing evidence supports the court's finding that placing her with Father would be "detrimental."  (*Id.*, subd. (a).)  We therefore affirm the court's dispositional order.

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

# FACTUAL AND PROCEDURAL BACKGROUND[2]

## A. *Overview*

At her birth in May 2024, A.T. along with Mother tested positive for amphetamine and methamphetamine. Mother admitted to being addicted to drugs for years and using methamphetamine throughout her pregnancy, including the day before A.T. was born. Mother was unsure if A.T.'s father was a former boyfriend or Father. A mandated reporter referred the matter to the Agency for investigation.

Mother and Father met in 2015, lived together for a short while, and since then their relationship has been "on and off." They have two other children, a nine-year-old daughter Y.M. and a seven-year-old son J.G. Both children were the subject of prior dependency proceedings.

## B. *Welfare History*

In June 2015 when Y.M. was a baby, the Agency received a report of domestic violence between the parents. Mother claimed Father choked her while she was holding Y.M. and she scratched him in self-defense. Father claimed Mother was intoxicated and he blocked the door to prevent her from leaving with the child. Police responded and arrested Mother. The Agency received another referral in 2015, after Father was arrested for carrying a gun inside a vehicle. The report stated Father "was aggressive and stalking Mother" and had threatened to "kill" her.

J.G.'s dependency began shortly after his birth in 2016 when he tested positive for amphetamine and methamphetamine. About two weeks before he was born, Father allegedly punched and kicked Mother, after she

---

[2] We summarize the facts in the record in the light most favorable to the juvenile court's dispositional order. (See *In re Shelley J.* (1998) 68 Cal.App.4th 322, 329.)

confronted him about being with another woman. Because of this incident, Mother told Father to leave when she was in the hospital delivery room giving birth to J.G. Father became angry and "began hitting the walls."

Father declined reunification services during J.G.'s dependency, blamed Mother for bringing the family to the Agency's attention, and admitted to "purposely avoiding contact with the Agency because he wanted . . . the case closed." After Mother relapsed, despite receiving 12 months of reunification services, the juvenile court terminated parental rights and maternal great-aunt Gloria T. adopted J.G.

During J.G.'s dependency, the Agency filed a section 300 petition on behalf of sibling Y.M. due to Mother's relapse and its concern of domestic violence between the parents. In December 2017, they engaged in a "violent altercation" while the children were in the home. Father, who appeared intoxicated, came to the family home at about 3:00 a.m. As Mother resisted his attempts to forcibly enter, a door struck her in the face. Father completed services including a 52-week domestic violence treatment program and reunited with Y.M. The juvenile court ultimately awarded him sole physical custody of the child, terminated its jurisdiction, and the family court ordered that Mother's visits with Y.M. were to be supervised.

**C. *The Petition and Detention***

In late May 2024, the Agency filed a section 300 petition on behalf of A.T., alleging she "has suffered or there is a substantial risk that the child will suffer, serious physical harm or illness" based on Mother's (1) substance

abuse; and (2) "domestic violence history with the alleged father [i.e., W.M.]."[3] (§ 300, subds. (b) & (d).)

Father admitted to allowing Mother to stay in his home, including about two weeks before A.T.'s birth, and on occasion leaving Y.M. in Mother's care while he was at work. He stated Mother would arrive unannounced, sometimes in the middle of the night; and the last time he left Mother alone with Y.M. she took the child to a neighbor's home and did not return. Father planned to obtain a restraining order against Mother to keep her from coming to his home.

About a month before giving birth to A.T., Mother claimed Father hit her "three times" with a "belt." She also reported he called her a "stupid ass f***ing bitch" "dumbass" and "bitch trash" in front of Y.M. Mother admitted staying "on and off" at Father's home when Y.M. was present and having unsupervised visitation with the child. The Agency therefore recommended against placing A.T. with Father.

Mother did not attend the May 30, 2024 detention hearing. Father attended but the juvenile court deferred appointment of counsel for him pending the results of a paternity test. The juvenile court found the Agency had made a prima facie showing that A.T. was a person described under section 300, subdivision (b) and that her detention was necessary because of "a substantial danger" to her well-being if she remained living with Mother. The court ordered the Agency to provide Mother with reunification services with liberal supervised visitation. The court further ordered A.T. to be detained with a relative caregiver (i.e., Gloria T.).

---

3      When the Agency filed the petition in May 2024, it did know if Father or Mother's former boyfriend was A.T.'s biological parent. The Agency subsequently added Father to the section 300 petition in July 2024.

5

**D.** *July Addendum*

In advance of the dispositional hearing, the Agency recommended (1) Father receive reunification services; (2) the juvenile court terminate Mother's services due to her ongoing substance abuse; (3) the parents have separate supervised visitation with A.T.; and (4) the child remain detained with Gloria T.

The Agency reported Mother had stayed with Father and Y.M. for "some days" in June or July. Father initially did not let Mother into his home because his girlfriend "Sasha" was with him. As a result, Mother slept outside next to his car.

Father began having visits with A.T. During one visit supervised by the Agency, he reported concerns about Gloria T., accusing the Agency of "not doing [its] job" in placing A.T. with her because she ran "[a] f***ing daycare" out of her home. He also accused the Agency of treating him like a "criminal," and the Agency social worker assigned to the case of "lying" to him. Other than text messaging and email, Father refused to communicate or "deal" with the social worker and demanded the Agency replace her. In early July, Gloria T. informed the Agency she no longer was willing to supervise visits between the parents and A.T. due to Father's "yelling and cussing," which made her feel unsafe.

The Agency recommended Father participate in reunification services including (1) individual counseling to address his ongoing relationship with Mother; and (2) parenting services due to the parents' domestic violence. Father, however, denied needing services; claimed he was in the process of obtaining a restraining order against Mother; and stated his last contact with her had been "six" or "[n]ine months ago." The Agency noted Mother,

6

Gloria T., and Sasha each acknowledged that Mother had recently stayed in Father's home with Father and Y.M.

## E. *September Addendum*

The Agency reported that at two months old, A.T. was assessed and diagnosed with "developmental delays, vision problems, and [a] suspect hemangioma, left anterior scalp." During a follow-up evaluation, the following diagnostic impressions were made: "Low average cognitive development, extremely low receptive communication, low average expressive communication, extremely low fine motor development, high average gross motor development with qualitative concerns. The caregiver was instructed to follow up with audiology, dermatology, and ophthalmology." Father refused to have A.T.'s physical therapy and infant education services take place during his visits, telling the Agency they should be done at the caregiver's home on her time.

Father initially attended therapy sessions in-person but then demanded they take place telephonically. His therapist reported Father used "foul language," and was "combative," "resentful," and lacked "impulse control" during their sessions, requiring the therapist to set boundaries with him. Father began missing therapy appointments. He did not participate in parenting and parent partner services, repeatedly ignoring calls and voicemail messages, leading to the closure of those referrals.

In August, the Agency made three requests of Father to drug test. In each instance he responded by asking for more visitation with A.T. He also asked when a new social worker would be assigned to the case, and refused to answer the Agency's phone calls to discuss visitation and his progress in services.

The Agency reported that Father's refusal to communicate, other than through text messages or email, "prevented the Agency from assessing and/or making referrals on his behalf aimed at addressing the protective issues and facilitating the reunification process." It also noted he initially failed to sign a consent form for A.T. to receive developmental services through the San Diego Regional Center; and his current behavior followed his pattern in prior dependency cases of limiting or avoiding contact with the Agency.

## F. *October Addendum*

The Agency's recommendations from the previous addenda remained the same.

A.T. was diagnosed with "gross motor delays" and "developmental delays" during her four-month wellness exam, with a recommendation she participate in weekly physical therapy and specialized instruction. Her developmental delays were 50 percent in areas of "cognitive, fine motor, gross motor, communication, and social emotional."

Father's attorney arranged and participated with Father in a telephone interview with the Agency. During the call, Father initially refused to answer questions about his progress in services; accused the Agency of making up an excuse to cancel a recent visit with A.T. due to her being sick, claiming it was "bull***t"; and denied that his daily use of marijuana was a protective risk factor for A.T. He admitted Mother had showed up at his home in late September to drop off items for Y.M. When the Agency informed him of its placement concerns due to Mother continuing to come to his home, Father explained he has "tried" to stop her and was "trying" to get a restraining order against her. The Agency social worker had to end the interview early, after Father ignored her warnings and repeatedly raised his voice at, and talked over, her.

8

During a second interview arranged by Father's attorney, Father reiterated he did not want A.T.'s services scheduled during his visitation. When asked by the Agency if he had contacted A.T.'s service providers, Father stated the Agency should be asking the providers whether they had contacted him. When told he also could contact Gloria T. for information on A.T.'s services, he reported they have a "blanket of issues." Father stated he did not need therapy to address his relationship with Mother, explaining she was "useless" to him.

## G. *Adjudication and Disposition*[4]

### 1. Testimony

The only witness to testify at the combined hearing was the Agency social worker who was assigned to the case in June 2024. She testified the Agency recommended against placement of A.T. with Father due to myriad "safety concerns," including: his past and current involvement with the Agency, in which there were concerns about his behavior, his refusal to engage in or complete services, and his lack of cooperation with the Agency, including limiting or avoiding communication with it; his past domestic violence against Mother and reported recent violence against her; his continued relationship with Mother, despite her ongoing use of controlled substances and his claim she may never change; his willingness to allow Mother into his home, and at times to live there and have unsupervised visits with Y.M.; his failure to obtain a restraining order against Mother that would prevent her from coming to his home; his promise to reduce his daily marijuana use only if A.T. were placed in his care; and questions as to his

---

[4] On September 16, 2024, prior to the contested hearing, the juvenile court elevated Father to presumed status.

ability to care for a newborn infant with "developmental delays" and "special needs" who would require around-the-clock care.

The Agency did not believe Sasha's presence in Father's home alleviated its placement concerns. The Agency noted that Sasha had frequently expressed being overwhelmed while supervising visits between Father and A.T., as she was also helping care for Y.M. The Agency also was concerned Father and Sasha had not been forthcoming about when she started living with him, based on conflicting information they had given the Agency.

## 2. Ruling

At the conclusion of testimony, the juvenile court admitted into evidence the Agency's reports, a written statement from Y.M., and, at Father's request, took judicial notice of the section 300 petitions of Y.M. and J.G. After hearing the argument of counsel, the juvenile court found true by a preponderance of the evidence the allegations in A.T.'s section 300 petition[5]; and found by clear and convincing evidence that removal of A.T. from Mother's physical custody was necessary.

As to Father, at the Agency's request, the juvenile court made findings under both sections 361, subdivision (d) (section 361(d)) and 361.2, subdivision (a) (section 361.2(a)). The court found the Agency had met its burden by clear and convincing evidence that (1) removal of A.T. from Father's physical custody was necessary (§ 361(d)); and (2) it would be "detrimental" to place her in his care (§ 361.2(a)).

As relevant here, the juvenile court found Father (1) had not "addressed the protective issues regarding domestic violence," crediting

---

[5] Father does not challenge the juvenile court's finding that A.T. is a dependent child under section 300, subdivisions (b) and (d).

Mother's report Father had recently hit her with a belt; and (2) continued to struggle with "anger management," as evidenced by his use of "abusive language" toward Mother in front of Y.M. and his interactions with the Agency and therapist. Based on this evidence, the court found Father had "not fully addressed underlying concerns which likely led to domestic violence."

The juvenile court also found concerning the "very toxic relationship" of the parents and their continued "engage[ment] with one another." The court noted Mother showed up at Father's home unannounced, despite her substance abuse history and current use. Although the court was prepared to issue a no (in-person) contact order against Mother, it doubted that would be sufficient to protect A.T. The court noted Father had not obtained a restraining order against Mother, despite having "ample opportunities" to do so during their "longstanding" relationship.

The juvenile court also was not persuaded that Father's ability to care for Y.M. supported placement of A.T. with him. The court noted A.T. was an infant with "special needs" who required "24 hours attention and care." The court had concerns about the "barriers" Father had imposed during A.T.'s dependency, its effect on her care, and his "reluctance" to participate in her services and his own. It noted that, when Father was "offered to participate in crucial developmental services for [A.T.]," he said, "Quote 'not on my time.'"

The juvenile court ordered A.T. to remain in relative care with Gloria T., Father to have liberal "structured" unsupervised visitation, and Mother to have liberal supervised visitation.

## DISCUSSION

Father contends section 361(d) applies in this case because, by requiring a finding there were no "reasonable means" to protect a dependent child other than removal from a parent (§ 361(d)), it imposed a higher standard than section 361.2(a). He further contends the court's findings in support of removal are not supported by clear and convincing evidence.

### I.

### Section 361.2 Applies in this Case

**A.** *Statutory Framework*

As noted, the juvenile court made findings as to Father under both sections 361(d) and 361.2(a). Section 361(d), which the Legislature added to the Welfare and Institutions Code in 2018 (Stats. 2017, ch. 665, § 1), governs the *removal* of a child from a custodial parent. It provides: "A dependent child shall not be taken from the *physical custody* of their parents . . . with whom the child did not reside at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to *physical custody*, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's . . . *physical custody*." (§ 361(d), italics added.)

Section 361.2(a) governs the *placement* of a child following removal from parental custody. It provides: "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of

12

Section 300, who desires to *assume* custody of the child.  If that parent *requests* custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."  (§ 361.2(a), italics added.)

## B. *Analysis*

We review questions of statutory interpretation de novo.  (*Adoption of A.B.* (2016) 2 Cal.App.5th 912, 919 (*A.B.*).)  In so doing, "[w]e start with the statute's words, which are the most reliable indicator of legislative intent." (*In re R.T.* (2017) 3 Cal.5th 622, 627 (*R.T.*).)  " 'We interpret relevant terms in light of their ordinary meaning, while also taking account of any related provisions and the overall structure of the statutory scheme to determine what interpretation best advances the Legislature's underlying purpose.' " (*Ibid.*)  "We construe the statute's words in context, and harmonize statutory provisions to avoid absurd results."  (*John v. Superior Court* (2016) 63 Cal.4th 91, 96.)  "If we find the statutory language ambiguous or subject to more than one interpretation, we may look to extrinsic aids."  (*Ibid.*)  " 'The interpretation of a statute is a question of law we review independently.' " (*A.B.,* at p. 919.)

The Agency argues section 361(d) does not apply in this case because at disposition Father did not have "physical custody" of A.T.; and thus the child could not be "taken" from him.  (§ 361(d).)  It further argues Father wanted to "assume custody" of A.T., as set forth in section 361.2(a), and the juvenile court to "place" her with him while the dependency continued.  (*Ibid.*)  We agree with the Agency.

We note the words "physical custody" in section 361(d) and "custody" in section 361.2(a) are not defined in the Welfare and Institutions Code.

13

We have concluded the words "custody," "place," and "placement" in section 361.2(a) were ambiguous, in rejecting a parent's argument that "custody" meant a noncustodial parent received "full legal and physical custody" of a dependent child absent a detriment finding. (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1128 (*Austin P.*).) Because each word appeared in the same statute, we presumed they had different meanings. (*Id.* at p. 1130.) We interpreted "custody" to mean a "parent is asking for the exclusive right to control decisions about the child and to have possession of the child—i.e., the parent is seeking sole legal and physical custody" (*id.* at p. 1131); and "place" or "placement" to "connote a temporary arrangement that necessarily involves the ongoing supervision of the juvenile court" (*ibid.*).

In reaching our decision in *Austin P.*, we looked to the Family Code and its definition of "physical custody." (*Austin P., supra*, 118 Cal.App.4th at p. 1130.) The Family Code defines "sole physical custody" to mean "that a child shall reside with and be under the supervision of one parent, subject to the power of the court to order visitation" (Fam. Code, § 3007); and "joint physical custody" to mean "that each of the parents shall have significant periods of physical custody . . . to assure a child of frequent and continuing contact with both parents" (*id.*, § 3004). We concluded that each definition "describes the right of a parent to have physical possession of and/or the right to make decisions about the child. Implicit in the definitions is that the parent has the right to exclude all others when making decisions pertaining to his or her child." (*Austin P.,* at p. 1130.)

We relied on other extrinsic aids in *Austin P.* to determine legislative intent, including Black's Law Dictionary. (*Austin P., supra*, 118 Cal.App.4th at pp. 1130–1131.) As relevant here, Black's Law Dictionary defines "physical custody" to mean "[t]he right to have a child live with the person

14

awarded custody by the court," also known as "residential custody." (Black's Law Dict. (12th ed. 2024) p. 1384, col. 2.) Moreover, the Random House Unabridged Dictionary defines "physical" as "of or pertaining to the body" (Random House Unabridged Dict. (2d ed. 1993) p. 1461, col. 3); and "custody" as "the right of determining the residence, protection, care, and education of a minor child or children" (*id.* at p. 494, col. 1).

Turning to the instant case, we conclude from the foregoing authorities that section 361(d) does not apply to Father because at disposition he did not have "physical custody" of A.T.; that is, he did not have the right to physical possession of, and/or the right to make decisions about, the child. (See *Austin P., supra*, 118 Cal.App.4th at pp. 1130–1131.) We note Father was not listed on A.T.'s birth certificate and was not at the hospital when she was born. He first learned A.T. was his child after detention, when the juvenile court had placed her with Gloria T. A.T. did not reside with Father (see Fam. Code, §§ 3004 & 3007); and he did not make any decisions regarding her residence, protection, or care. Nor did Father attend her medical appointments or participate in her services. (See *Austin P.,* at pp. 1130–1131.)

We further conclude section 361.2(a) applies in this case. At the time of disposition, Father was seeking (1) custody of A.T., as he admitted to the Agency[6]; and (2) placement, after the juvenile court removed her from Mother's physical custody.

Father argues there allegedly is no need for a parent to "have some type of legally-recognized [*sic*] custody beforehand" in order for section 361(d)

---

[6] In October, during an interview with two Agency social workers and his attorney, Father stated "mother has parental right[s] and his next step was to *file for custody*." (Italics added.)

15

to apply.  He further argues there is "good reason" to "exclude 'custody' from the criteria for determining whether section 361(d) applies in a given case," claiming the word "custody" is "too complicated" and has been misconstrued by courts.  Instead, he argues the key to the statue's application is its requirement that a dependent child "not reside [with a parent] at the time the petition was initiated."  (§ 361(d).)  We are not persuaded.

First, we are not at liberty to ignore language in a statute simply because the words are "complicated" or involve a complex subject matter. (See *Fort Bragg Unified School Dist. v. Colonial American Casualty & Surety Co.* (2011) 194 Cal.App.4th 891, 909–910 ["our role is to interpret statutes, not to write them"].)

Second, section 361.2(a) also has a nonresident requirement, which is nearly identical to the one in section 361(d).  (Compare § 361(d) ["with whom the child did not reside at the time the petition was initiated"]; with § 361.2(a) ["with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300"].)  Given this similarity, the nonresident requirement Father relies on provides no meaningful guidance in determining which of the two statutes applies in a given situation.  (See *R.T., supra*, 3 Cal.5th at p. 627; accord, *Borden v. Stiles* (2023) 92 Cal.App.5th 337, 345–346 [in interpreting a statute, we "harmonize that language with related provisions by interpreting them in a consistent fashion"].)

Third, Father's proposed interpretation would require us to ignore the words "physical custody" in section 361(d), which are used repeatedly in the statute.  To read these words out of the statute, as Father suggests, would contravene well-accepted rules of construction that significance should be afforded " 'to *every* word, phrase and sentence in pursuance of the legislative

16

purpose' " to avoid " 'making some words surplusage.' " (*In re A.V.* (2017) 11 Cal.App.5th 697, 704–705, italics added)].)

In sum, we conclude section 361.2 applies in this case because Father was *seeking* custody of A.T. after the juvenile court removed her from Mother's *sole* physical custody. (See *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 303 (*D'Anthony D.*) ["By its terms, section 361 applies to a custodial parent, while placement with a noncustodial parent is to be assessed under section 361.2."]; *In re Abram L.* (2013) 219 Cal.App.4th 452, 460–461 [juvenile court committed prejudicial error, after removing the dependent children from the custodial parent under § 361, subd. (c), by failing to apply § 361.2 to the noncustodial parent who requested placement]; *Austin P., supra*, 118 Cal.App.4th at pp. 1130–1131 [§ 361.2 "refers to a parent's request for 'custody' "].)

## II.

## Substantial Evidence Supports the Juvenile Court's Detriment Finding

### A. *Guiding Principles*

Section 361.2 "evinces the legislative preference for placement with the noncustodial parent when safe for the child." (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262 (*Patrick S.*).) In making a finding of detriment, the juvenile court "weighs all relevant factors to determine if the child will suffer net harm." (*In re A.C.* (2020) 54 Cal.App.5th 38, 43.) In making this assessment, the court " 'may consider a parent's past conduct as well as present circumstances.' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 247.) The burden is on the party opposing placement to show the child will be harmed if the noncustodial parent receives custody. (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1402.)

17

We apply the substantial evidence standard to review a juvenile court's detriment finding under section 361.2(a).  (*Patrick S., supra*, 218 Cal.App.4th at p. 1262.)  The juvenile court must make findings of detriment by clear and convincing evidence.  (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426.)  In applying this heightened standard of review, the question before us is " 'whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.'  [Citation.]  We view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*In re M.V.* (2022) 78 Cal.App.5th 944, 960 (*M.V.*).)

**B.  *Analysis***

Father does not directly challenge the juvenile court's detriment finding under section 361.2(a).  Instead, his challenge is to the court's alternate finding (also under the clear and convincing evidence standard) that having A.T. live with him, or his exercise of "physical custody," "would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child."  (§ 361(d).)

Courts have concluded the two statutes are "fundamentally the same" with regard to their respective "substantial danger" (§ 361(d)) and "detriment[ ]" (§ 361.2(a)) requirements.  (*In re Andrew S.* (2016) 2 Cal.App.5th 536, 545, fn. 5; accord, *In re Anthony Q.* (2016) 5 Cal.App.5th 336, 339 [the erroneous application of § 361 to a noncustodial parent was harmless error]; *D'Anthony D., supra*, 230 Cal.App.4th at p. 304 [reliance on § 361 and not § 361.2(a) in refusing to place the child with "a noncustodial

18

parent" was harmless error due to the "similarity between these statutes' mandatory findings"].) We agree.

Father argues the evidence of the parents' domestic violence and what he terms the "unpled child safety issues" were insufficient to support a finding by clear and convincing evidence of detriment (i.e., substantial danger) to A.T.'s well-being. We are not persuaded.

The evidence shows the parents had a long history of documented domestic violence and a recent report of domestic violence shortly before A.T. was born. Father on appeal argues he had a "zero tolerance for illicit substances" and, "while not a valid excuse," that is why he struck Mother with the belt "precisely because she 'wanted to go use.'" Father's argument actually supports the court's detriment finding in this case.

Indeed, the evidence shows Mother continued to use controlled substances and appear unannounced at Father's home during A.T.'s dependency. Father, however, took no meaningful steps to prevent her from doing so and on occasion even allowed her to live with him and Y.M., including *after* dependency began; and, as credited by the juvenile court, engaged in domestic violence against Mother when she wanted to use, which (in his opinion) would never stop. From this evidence, the court could reasonably find it was "highly probable" that A.T. would suffer detriment if placed with Father due to the risk of parents' engaging in domestic violence, given Mother's ongoing use of controlled substances, her inclination to show up at Father's home unannounced, and Father's response when she sought to use illicit drugs. (See *M.V., supra*, 78 Cal.App.5th at p. 960.)

Father argues there is insufficient evidence to support the juvenile court's finding that his failure to "cooperate" with the Agency during A.T.'s

19

dependency would be "detrimental" to the child's "physical or emotional well-being." (§ 361.2(a).) We disagree.

The evidence shows Father denied needing any services during A.T.'s dependency, failed to engage in some services (i.e., parenting and parent partner services), and when he did participate in services, failed to complete them (i.e., therapy). And the evidence showed this was not the first time Father refused, or failed to meaningfully participate in, services when dealing with the Agency, as he engaged in similar behavior during J.G.'s dependency.

More concerning, however, is evidence that Father did not appear to support or participate in services for A.T., despite the child being diagnosed with "developmental delays" and "special needs" and having underlying medical issues. The juvenile court noted that Father refused to have A.T.'s services take place during his visitation, instructing the Agency they should be done at the caregiver's home on her time. The evidence also showed Father delayed in giving consent for A.T. to receive services at the San Diego Regional Center because he was angry and wanted more visitation, including unsupervised visitation. This evidence supports the inference that Father put his own interests ahead of A.T.'s; and, in turn, supports the finding it would be detrimental to place her with him. (See *M.V., supra*, 78 Cal.App.5th at p. 960.)

Equally concerning is evidence that, as the dependency progressed, Father limited communication with the Agency to text messages and email; and refused to speak with the Agency over the telephone or in-person unless his attorney participated on the call. Although Father claims that was due to the behavior of one Agency social worker in particular, there is evidence he engaged in similar behavior toward the Agency in J.G.'s dependency. This

evidence supports the juvenile court's finding that Father erected "barriers" when it came to dealing with the Agency, which in turn would be detrimental to A.T. if placed with Father, given the juvenile court's continuing supervision of the child and the Agency's role in addressing the protective issues and facilitating the reunification process. (See *M.V., supra*, 78 Cal.App.5th at p. 960.)

Viewing, as we must, the record as a whole and in the light most favorable to the juvenile court's dispositional order, we conclude clear and convincing evidence supports the court's finding that it would be "detrimental to the safety, protection, or physical or emotional well-being" of A.T. if placed with Father at the time of disposition. (§ 361.2(a).)

## DISPOSITION

We affirm the juvenile court's dispositional order.


KELETY, J.

WE CONCUR:



DO, Acting P. J.



CASTILLO, J.

21